**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Cynthia Carrie WILLIAMS, Defendant–Appellant.**

**No. 90–2630.**

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1991.

Decided Oct. 7, 1991.

MOODY, District Judge.

Cynthia Williams pled guilty to one count of possession with intent to distribute almost five kilograms of cocaine. 21 U.S.C. § 841(a)(1). Williams reserved her right to appeal the district court's denial of her motion to suppress the cocaine at issue. FED.R.CRIM.P. 11(a)(2). We affirm.

## I. BACKGROUND

On December 7, 1989, Chicago police officers Robert Glynn and Richard Crowley were on duty at Union Station as part of a federal Drug Enforcement Administration task force. Glynn reviewed an abstract of a passenger train manifest provided by Amtrak Investigator Dennis Kroll. The abstract showed that: (1) the train originated in Los Angeles; (2) the train carried a passenger travelling as "Cynthia Rymes," later identified as Williams [1]; (3) "Rymes" paid $415 in cash for her ticket; (4) "Rymes" was traveling in a private sleeping compartment; and (5) the telephone call-back number on the "Rymes" ticket was apparently fictitious, for when Kroll dialed the number and asked for "Rymes," the person on the receiving end told him he had a wrong number.

At Union Station, Glynn boarded the train, where an attendant pointed Williams out as "Rymes." Williams subsequently left the train, obtained a cart, and then returned to the train. Crowley watched her as she loaded her luggage on the cart. Williams then headed for the main terminal.

The parties are at odds over the nature of Williams's demeanor up to this point. The government brief maintains that she appeared "quite nervous and hurried, and was looking around quite a bit." The government further contends that after loading her luggage and while heading for the main terminal, she again looked up and behind her. Williams's brief, on the other hand, presents summaries of testimony at the suppression hearing, including her own testimony that upon leaving the train she

Jeffrey E. Stone, Asst. U.S. Atty., Morris Pasqual (argued), Office of the U.S. Atty., Criminal Div., Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Dennis A. Giovannini (argued), Giovannini & Goldberg, Chicago, Ill., for defendant-appellant.

Before FLAUM and RIPPLE, Circuit Judges, and MOODY, District Judge.*

* The Hon. James T. Moody, District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

1. At no relevant time did the officers know "Rymes" was an assumed name.

looked around at Glynn because he was staring at her. Officer Glynn further testified he did not find it suspicious that Williams looked back toward her luggage while getting a cart. Both officers also testified that Williams did not run or hurry. Finally, Glynn testified that Williams had done nothing unusual before the officers approached her.

As Williams entered the main terminal of Union Station and headed for a taxi stand, the officers moved in. At this point the parties' opposing accounts of the facts begin to diverge significantly. There seems to be agreement, however, on some points: Glynn stood in front of Williams and Crowley behind her. The officers were dressed in plainclothes, and identified themselves as police. Glynn asked if Williams would speak to them; she assented. In the course of the conversation, Glynn asked Williams for identification; she said she had none. Glynn then asked to see her train ticket; she presented the ticket to Glynn, who inspected and returned it. Then, coming straight to the point, Glynn informed Williams that he was a narcotics investigator conducting a narcotics investigation. Glynn asked Williams if she had drugs in her bags. When she denied carrying drugs, he asked for consent to search the luggage. Williams consented.

As for the divergence in the parties' factual accounts, Williams asserts that: when the officers initially approached, Glynn grabbed the back of her arm; the officers trapped her between them so she could not move; she noticed a gun; and the officers never said she was free to leave. Williams further contends that: she refused consent to search at first; she relented only when Glynn threatened to get a warrant; and the officers never told her she could withhold consent. The government details the initial encounter much differently, maintaining as follows: when the officers moved in, there was no gun play; Glynn explained he was a narcotics officer, but he also told Williams she was not under arrest and could leave at any time; and Williams expressed understanding of her ability to leave. According to the government, Glynn proceeded to ask if Williams had packed her luggage; she replied that she did not know its contents. Williams then became very nervous in the government's account, began to fidget, and spoke in a "dry-mouth" manner. Finally, in the government's version of events, when Glynn asked Williams for consent to search her luggage he explained she could refuse, and again told her she was free to leave.

The parties do not dispute the denouement of this encounter. Upon obtaining consent, the officers searched Williams's luggage, finding the cocaine. They seized the drugs and arrested Williams, who was subsequently indicted on the charge underlying her conviction.

In the district court, Williams moved to suppress the cocaine. Judge Plunkett conducted an evidentiary hearing, and later denied the motion with an oral ruling, the complete transcript of which reads as follows:

> The case basically comes down to the credibility of the defendant vs. the two agents who testified, and there are two issues: One is, was the original questioning of the defendant proper, and, secondly, did she give her consent voluntarily.
>
> The agents approached her because of the profile that the manifest showed, which is a rather standard procedure. She paid cash, she bought her ticket the same day, she was coming from Los Angeles, and she bought a compartment.
>
> Both agents pretty well agree that on the platform she was looking around. Now, it may very well be that she was looking around because she saw the agents, didn't know who they were, and was concerned about herself, but I don't think that has any affect on the agents' right to talk to her. Indeed, I don't think that is even necessary. They could have asked to talk to her based on what they knew before she got off the train.
>
> Then the question is whether she voluntarily consented to talk and voluntarily consented to the search. The agents testified that they did not surround her and that they did not show a gun, and that

they simply asked to talk to her and that she agreed.

The defendant testifies that the agents made essentially a sandwich out of her, that she was in the middle of the two of them, and felt she couldn't leave.

Because the defendant's credibility was hurt at the hearing, I've decided to accept the testimony of the agents. The reason that is, is the defendant has a prior conviction—which doesn't mean she is not telling the truth, but she was directly impeached on a matter from her own affidavit in which she said she thought there might be a gun, and at the hearing she testified she saw a gun, and that's a substantial change in a story which remained unexplained.

Accordingly, I will accept the testimony of the agents that they followed proper procedure, that she was not coerced in any way, that she voluntarily gave a statement to them, and that she voluntarily consented to have the luggage searched.

The motion to suppress is denied.

By this appeal, Williams challenges the district court's refusal to suppress the cocaine. She raises two issues: Did the police detain her in Union Station such that the fourth amendment was implicated before her consent to the search? If so, did the police have reasonable suspicion justifying the detention?

## II. ANALYSIS

The fourth amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." Before the fourth amendment and its attendant exclusionary rule are implicated, the government must conduct a search or seizure. In this case, there is plainly a search and seizure of drugs followed by an arrest. The primary issue in this appeal, however, is whether any seizure of Williams occurred *before* the search.

■ Not every encounter between the police and a citizen is a seizure under the

fourth amendment. This court has recently described the various categories of police interaction with citizens:

> The first category is an arrest, for which the Fourth Amendment requires that police have probable cause to believe a person has committed or is committing a crime. The second category is an investigatory stop, which is limited to a brief, non-intrusive detention. This is also a Fourth Amendment 'seizure,' but the officer need only have specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime. The third category involves no restraint on the citizen's liberty, and is characterized by an officer seeking the citizen's voluntary cooperation through non-coercive questioning. This is not a seizure within the meaning of the Fourth Amendment.

*United States v. Johnson,* 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991) (citations omitted). In other words, the police do not conduct a seizure "simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick,* —— U.S. ——, ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *see also Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (plurality opinion). Elaborating on the third category, this court has held that in a consensual encounter "the degree of suspicion that is required is zero." *United States v. Serna–Barreto,* 842 F.2d 965, 966 (7th Cir. 1988).

■ Applying this law on appeal, our standard of review is well settled: We will not overturn the district court's denial of a motion to suppress unless the decision was clearly erroneous. *Johnson,* 910 F.2d at 1508; *United States v. Edwards,* 898 F.2d 1273, 1276 (7th Cir.1990). For the most part, "[o]ur inquiry is factually based and requires that we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witnesses." *Edwards,* 898 F.2d at 1276. To the extent that legal determinations factor into a suppression ruling, however, they are subject to *de*

*novo* review. *United States v. Parker*, 936 F.2d 950, 953 n. 1 (7th Cir.1991) (collecting cases).

If Glynn and Crowley initially conducted an investigatory stop of Williams, then the government has the burden of showing reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). If the initial encounter was entirely consensual such that no seizure occurred, then the government has no burden to show any degree of suspicion, and the cocaine is not the fruit of an unconstitutional act.

The distinction between a *Terry* stop and a consensual encounter is essentially factual under controlling Supreme Court precedent deriving from Justice Stewart's plurality opinion in *United States v. Mendenhall*, 446 U.S. 544, 550–57, 100 S.Ct. 1870, 1875–79, 64 L.Ed.2d 497 (1980). Most recently, a majority of the Court has expressed the test in the following manner: "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Bostick*, —— U.S. at ——, 111 S.Ct. at 2386 (quoting *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 1551–52, 113 L.Ed.2d 690 (1991)). This court has applied the *Mendenhall* plurality standard since *United States v. Black*, 675 F.2d 129, 134 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983), having more recently explained it in the following terms:

> The proper test for determining whether a given encounter rises to the level of a fourth amendment seizure is "if in the totality of the circumstances, a reasonable person would not believe that his freedom of movement is restrained, or believes that he remains at liberty to disregard a police officer's request for information, a seizure has not occurred." *United States v. [Espinoza–Alvarez]*, 839 F.2d 1201, 1205 (7th Cir.1987) (quoting *United States v. Dyer*, 784 F.2d 812, 815 (7th Cir.1986)).

*Edwards*, 898 F.2d at 1276. Justice Stewart's *Mendenhall* opinion, moreover, provided rather specific guidance in distinguishing seizures from non-seizures:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

*Mendenhall*, 446 U.S. at 554–55, 100 S.Ct. at 1877–78 (citations omitted). This court has also identified relevant factors, "including whether defendant believed she was free to leave, the types of questions asked by the agents, the duration of the questioning, and the setting of the encounter." *United States v. Sterling*, 909 F.2d 1078, 1082 (7th Cir.1990) (citations omitted).

The ruling below on the motion to suppress does not expressly "make specific findings of fact concerning whether a reasonable person would have felt free to terminate the questioning." *United States v. Borys*, 766 F.2d 304, 310 (7th Cir.1985). As in *Borys*, had Judge Plunkett "made this finding ... then this Court's task of reviewing that decision would be simplified." *Id.* Nevertheless, the decision below is sufficiently focused for us to reach a decision without "fact-finding in the first instance, which is an inappropriate exercise for an appellate tribunal." *Id.* (citations omitted).

It is apparent to this court that Judge Plunkett, like Judge Hart in *United States v. Ferguson*, 935 F.2d 1518 (7th Cir.1991), "impliedly rejected any contention that the encounter was constitutionally defective. We are convinced from the actions of the trial court that the court was of the opinion ... that the encounter at the station was consensual." *Ferguson*, at 1522 n. 3. It is true that "voluntariness," the concept expressly employed by the district court, is not the issue, for even an arrested person

is capable of making voluntary statements and consenting to a search. But Judge Plunkett's ruling expressly addressed factors of the sort relevant to the seizure determination. Specifically, Judge Plunkett credited the officers' testimony over Williams's in assessing whether or not the police made a "sandwich" of her or displayed weapons. He credited the police with following "proper procedure," and discredited Williams's testimony that she did not feel free to leave. Most significantly, he expressly credited the officers' testimony that "they simply asked to talk to [Williams] and that she agreed" and "that she was not coerced in any way."

■ While the ultimate findings and ruling below do not speak in the precise terms of *Mendenhall* and its progeny, they do show that Judge Plunkett focused on the nature of the initial police interaction with Williams. We will not reverse the district court's ruling unless it was clearly erroneous in finding the initial contact leading up to Williams's consent to search was, as a matter of fact, consensual rather than a seizure. *Edwards*, 898 F.2d at 1276. We find no clear error in the district court's decision. Rather, the record, in light of the district court's factfinding, reflects a brief encounter in a public setting with no physical oppression. In other words, a run of the mill consensual encounter.

■ Williams raises only one contrary argument meriting attention. She contends that the initial encounter escalated into a seizure before her consent to search because of Glynn's communication with her. Specifically, she argues a *Terry* stop occurred "by the time the officers announced they were narcotics officers and wanted to search the defendant's bags." Williams Br. at 28. This position has some support in the case law. In *Borys*, the court held that a consensual encounter escalated into a *Terry* stop when "two agents explained that they suspected Borys of transporting drugs and asked permission to search his luggage.... In these circumstances where Borys knew that the agents had positively identified him as a suspect, a reasonable person would not have felt at liberty to leave." *Borys*, 766 F.2d at 304 (holding reasonable suspicion supported the seizure). *See also United States v. Palen*, 793 F.2d 853, 857 (7th Cir.1986). Williams argues that Glynn and Crowley had made their suspicion of her so apparent that a reasonable person would not have felt free to leave. But this argument cannot succeed solely on Glynn's identification of himself and his mission. This court has held that such an explanation is inherently less likely to restrict freedom than the absence of an explanation for the encounter. "[I]f a federal agent starts asking questions, and asks to search one's luggage, without giving any statement of purpose, one is apt to be more alarmed—and will certainly have less forewarning of danger—than if the agent explains what he is looking for." *United States v. Notorianni*, 729 F.2d 520, 522–23 (7th Cir.1984). Nor can Glynn's request for consent to a search be deemed a *per se* paralyzing communication that escalates every consensual encounter into a *Terry* stop. *See United States v. Berke*, 930 F.2d 1219, 1221–22 (7th Cir.1991) (no seizure at point where officers explained they were conducting narcotics investigation and asked for consent to search); *United States v. High*, 921 F.2d 112, 113–16 (7th Cir.1990) (same); *Johnson*, 910 F.2d at 1507, 1509 (same); *Edwards*, 898 F.2d at 1275–76 (same); *United States v. Jaramillo*, 891 F.2d 620, 623, 625 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990) (same); *United States v. Morgan*, 725 F.2d 56, 58 (7th Cir.1984) (same). The district court evaluated the evidence on the nature of the encounter leading up to Williams's consent to search, finding that encounter consensual. That the officers explained themselves and eventually made the request for consent does not, as a matter of law, show the district court to be in error.

Having reviewed the record of the proceedings below, this court holds that no clear error is presented by the district court's ruling. Judge Plunkett properly characterized the matter as turning on the veracity of witnesses, and this court will not second guess his on-the-scene credibility determinations.

### III. CONCLUSION

In their initial encounter with Williams, the police did not seize Williams within the meaning of the fourth amendment. Nor did the police interaction with Williams escalate into a seizure before her consent to search. Accordingly, the government need not show reasonable suspicion supporting the initial encounter and its fruits. The district court properly denied the motion to suppress the cocaine, and the conviction is AFFIRMED.