998 F.2d 1017
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Antonio V. THOMPSON, Defendant-Appellant.
 No. 92-3550.
 United States Court of Appeals, Seventh Circuit.
 Argued July 7, 1993.
Decided July 20, 1993.
 
 Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 
 ORDER
 
 1
 Antonio Thompson appeals from his conviction for (1) conspiracy to possess with intent to distribute cocaine, a violation of 21 U.S.C. § 846; (2) possession with intent to distribute cocaine, a violation of 21 U.S.C. § 841(a)(1); and (3) traveling in interstate commerce to promote narcotics offenses, a violation of 18 U.S.C. § 1952. We affirm.
 
 
 2
 * Here is yet another Fourth Amendment case involving passengers who arrive with drugs in their possession at Chicago's Union Station by way of Amtrak's Number Four train (also known as the Southwest Chief), which originates in Los Angeles, California.[1]
 
 
 3
 The parties do not dispute the relevant facts. When the Southwest Chief pulled into Union Station on the afternoon of February 6, 1990, awaiting it was Dennis Kroll, a fifteen-year veteran of the Amtrak Police Department and also a member of the United States Drug Enforcement Agency (DEA) Task Force. On the platform, Kroll was joined by Richard Crowley, an officer with the Chicago Police Department for thirty years and a member of the drug task force for the past six years.
 
 
 4
 While neither officer was waiting for any specific passenger, each knew Los Angeles to be a source city of illegal drugs--that is, a city known to be a point of entry for drugs that are illegally smuggled into the United States before being distributed to other domestic cities. The Southwest Chief is a popular mode of transportation for drug couriers, who seem to prefer to travel in cars equipped with sleeper berths. For that reason the officers positioned themselves on either side of the door of the last sleeper car as it pulled in.
 
 
 5
 When the train stopped and disgorged its passengers, Thompson was the first to emerge. He was carrying a garment bag as well as an attache case and looked nervously in both directions before making eye contact with Crowley and walking away. Crowley followed Thompson into the station, observing him scan the passengers to both his right and left. Twice Thompson looked back over his shoulder in the direction of the train.
 
 
 6
 Soon after Thompson moved towards the station, Roberto Mejia-Espinal left the same sleeper car, looked both ways, and briefly rested his bags on the platform. After Thompson entered the main concourse, he turned, waved, and whistled at Mejia, who was behind him. Mejia then joined Thompson, and the two men proceeded to the "grand room" of the station. Neither individual stopped at the baggage claim area to collect luggage.
 
 
 7
 Kroll and Crowley continued to follow. Just as the defendants arrived at the grand room, Crowley asked if they would mind answering a few questions. At that time, the officers announced that they were police and presented their badges. Crowley explained that he was with the Chicago Police and was conducting a narcotics investigation. He also told Thompson and Mejia that they were not under arrest and were free to leave at any time.
 
 
 8
 Crowley asked for identification and train tickets from both defendants. Each produced driver's licenses from California and train tickets bearing their own names. The tickets, for travel from Los Angeles to New York, indicated that they had been paid for in cash. After a brief examination of the tickets and licenses, Crowley returned them. Thompson then asked why the officers were "bothering" to speak to them. Crowley responded that he and Kroll were conducting an ongoing investigation into drug couriers arriving in Chicago from source cities such as Los Angeles.
 
 
 9
 Thompson then became nervous, according to Crowley. His hands shook. He had trouble returning the train tickets into an envelope. Beads of perspiration dotted his face. He stopped talking. Crowley asked whether Thompson was okay. In response, Thompson said he would "be okay in just a minute or two." Once again, Crowley told the defendants that they were not under arrest.
 
 
 10
 At this point, Crowley asked Thompson and Mejia whether the luggage they were carrying belonged to them. Each defendant answered in the affirmative. Crowley then inquired whether they had packed the luggage themselves, and if they knew what was inside. Mejia responded that they had done their own packing and that the baggage contained only clothes. Crowley asked whether they were transporting anything for anyone else. Mejia replied that they were not.
 
 
 11
 Crowley then asked Thompson and Mejia if they would consent to a search of their luggage for controlled substances. He specifically explained that he could not search their bags unless he had a search warrant (which he did not) or they consented. Thompson initially hesitated but then agreed that Crowley could search his luggage. He had nothing to hide, he said. Mejia also agreed to the search. He, too, said that he had nothing to hide.
 
 
 12
 Crowley first searched Thompson's garment bag. Inside he found an attache case atop some clothing. At once, Thompson claimed the brief case was not his. He could not, however, explain how it wound up in his bag. Crowley opened the attache case and found a package containing cocaine. He then asked Mejia once again if he could search his bag. Mejia said yes. Inside Mejia's bag Crowley found a similar package. Crowley then placed the defendants under arrest. The entire encounter lasted about ten minutes.
 
 
 13
 The defendants filed a pre-trial motion to suppress this evidence as the fruit of an illegal seizure and search. After holding a hearing, Magistrate Judge Weisberg granted the motion. The government filed timely objections to the report and recommendation, to which the defendants did not respond. The district court judge entered a memorandum opinion and order declining to follow the magistrate judge's report and recommendation. The district court denied the defendants' motion for reconsideration.
 
 
 14
 Thompson went to trial. (Mejia fled and is not a party to this appeal.) A jury found him guilty of drug-related offenses. Thompson filed timely motions for a judgment of acquittal and for a new trial, both of which Judge Marovich denied before sentencing him to a term of imprisonment of 72 months and four years of supervised release. He appeals his conviction, arguing that the district court erroneously admitted evidence that was seized in violation of his rights under the Fourth Amendment.
 
 II
 
 15
 In reviewing suppression rulings, we apply the clear error standard to the district court's legal determinations as well as to its findings of fact. United States v. Adebayo, 985 F.2d 1333, 1337 n. 2 (7th Cir.), cert. denied, 113 S.Ct. 2947 (1993). The district court in this instance adopted the magistrate judge's factual findings in their entirety but reached a different legal conclusion.
 
 
 16
 The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." As the Supreme Court has recognized again and again (and as recently as last month), "searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well delineated exceptions." Minnesota v. Dickerson, 1993 U.S. LEXIS 4018, at * 12 (U.S. June 7, 1993) (quotations and citations omitted).
 
 
 17
 But not every encounter between a police officer and a citizen is a seizure under the Fourth Amendment. United States v. Adebayo, 985 F.2d 1333, 1337 (7th Cir.), cert. denied, 1993 U.S. LEXIS 3999 (U.S.1993); United States v. Withers, 972 F.2d 837, 841 (7th Cir.1992); United States v. Williams, 945 F.2d 192, 195 (7th Cir.1991). When an officer elicits the voluntary cooperation of a citizen through noncoercive questioning, the liberty of the individual is not restrained and the contact does not rise to the level of a seizure. United States v. Black, 675 F.2d 129, 133 (7th Cir.1982). Rather, the encounter is consensual. Since Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court on numerous occasions has held that mere police questioning does not constitute a seizure. See, e.g., Florida v. Bostick, 111 S.Ct. 2382, 2386 (1991); Florida v. Royer, 460 U.S. 491 (1983) (plurality opinion). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' ... the encounter is consensual and no reasonable suspicion is required." Bostick, 111 S.Ct. at 2386 (citation omitted). If the police do not convey the message that compliance with their requests is required, the officers may ask questions of an individual, ask to examine the person's luggage or have him produce identification, and request permission to search his luggage. Id. (citing Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984); INS v. Delgado, 466 U.S. 210, 216 (1984); Royer, 460 U.S. at 501; United States v. Mendenhall, 446 U.S. 544, 557-58 (1980). In order to initiate a stop or make these requests, "the degree of suspicion required is zero." United States v. Serna-Barreto, 842 F.2d 965, 966 (7th Cir.1988). The government bears the burden of proving that the defendant freely and voluntarily provided the requisite consent. Royer, 460 U.S. at 497. A consensual encounter escalates into a seizure if the officer has no reasonable suspicion and "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' "[2] Michigan v. Chesternut, 486 U.S. 567, 573 (1988) (adopting test established by Justice Stewart in Mendenhall, 446 U.S. at 554). See also Tom v. Voida, 963 F.2d 952, 957 (7th Cir.1992) (observing that the Supreme Court has held that in some cases the Mendenhall test states only a necessary condition for seizure).
 
 
 18
 In applying the Mendenhall test, this court has enunciated a number of factors for use in determining whether a reasonable person would believe his encounter with the police to be consensual. These include (1) whether the encounter occurred in a public or private place; (2) whether the suspect consented to talk with the law enforcement agents; (3) whether the agents informed the suspect that he was not under arrest and was free to leave; (4) whether the agents removed the suspect to another area; (5) the threatening presence of several officers; (6) the display of a weapon by an officer; (7) some physical touching of the suspect; (8) the use of language or tone of voice indicating that compliance might be compelled; and (9) the duration of the encounter. See Adebayo, 985 F.2d at 1338.
 
 
 19
 The district court held that the encounter between Thompson and the officers remained consensual and did not escalate into an investigatory detention. United States v. Thompson, No. 90 CR 100, at 11-12 (N.D.Ill. filed 6 Dec. 1991). Thompson disputes that holding, arguing as he did in his motions to suppress and to reconsider that the transaction intensified into a nonconsensual investigatory stop. The facts show, however, that the encounter was indeed consensual and did not activate Thompson's rights under the Fourth Amendment. In consideration of the nine elements mentioned above, the circumstances would lead a reasonable person to believe that he was free to leave. The government argues compellingly that the encounter occurred "in a quintessential public place". Nothing in the record suggests that Crowley and Kroll moved Thompson any further than a few steps away from pedestrian traffic. According to Thompson's own testimony, he consented to talk with the two officers, who were the only ones at the detention. They informed him that he was not under arrest and was at liberty to leave. The facts do not indicate that either officer displayed a weapon or intimidated Thompson. And the entire incident lasted only ten minutes.
 
 
 20
 In denying Thompson's motion to suppress, the district court relied heavily upon Williams, whose facts bear a striking resemblance to the case at hand. This court rejected Williams's argument that her initial consensual encounter with agents in Union Station escalated into an unlawful seizure when the officers announced that they were narcotics investigators and wanted to search her bags. The court held that an officer's identification of himself and his mission is inherently less restrictive than the failure to explain the encounter. 945 F.2d at 197. In addition, Williams reiterates that an officer's explanation that he is conducting an investigation for narcotics, followed by his request to search, is not "a per se paralyzing communication that escalates every consensual encounter into a Terry stop." Id. (citations omitted).
 
 
 21
 Thompson's attempt to distinguish this case from Williams is unpersuasive. First, Thompson argues that unlike the officers in Williams, Crowley and Kroll repeated that they were narcotics agents. This distinction is at odds with the logic of Williams: If a single explanation by an officer about the purpose of questioning "is inherently less likely to restrict freedom than the absence of an explanation for the encounter", 945 F.2d at 197, then two explanations must be half as likely to impinge liberty when they are delivered in an unintimidating fashion. The record contains no evidence that Crowley's restatement of his mission was inherently coercive. Cf. United States v. Borys, 766 F.2d 304, 310 (7th Cir.1985), cert. denied, 474 U.S. 1082 (1986) (two requests to see plane ticket did not pressure subject). Moreover, Crowley repeated the reason for the stop only after Thompson asked why the officers were interested in talking to him. Cf. United States v. Johnson, 910 F.2d at 1506, 1507 (7th Cir.), cert. denied, 498 U.S. 1051 (1991) (in response to subject's question, agent explained he was investigating violations of the narcotics laws).
 
 
 22
 Second, Thompson observes that in contrast to Williams, "there were no inconsistencies or efforts at deception". This observation is irrelevant for purposes of determining whether a reasonable person in Thompson's situation would have believed that he was free to terminate the questioning and go about his business.
 
 
 23
 Third, Thompson notes that his circumstances differ from Williams because Crowley and Kroll were determined to detain his baggage for a dog-sniff test if he did not consent to search. Again, this observation, if true, is a non sequitur. As Justice Blackmun observed in Chesternut, "the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted." 486 U.S. at 574 n. 7 (citations omitted). Significantly, nothing in the record establishes that Thompson knew that a dog-sniff test was imminent if he did not consent to search.
 
 
 24
 Fourth and last, Thompson argues that the officers asked numerous questions that, unlike in Williams, "strongly implied" their intent to search Thompson's luggage. But even direct, unequivocal communication that a subject's bags will be detained for a search does not necessarily result in seizure. United States v. Sullivan, 903 F.2d 1093, 1097-98 (7th Cir.1990). While the officers did not inform Thompson that his bags certainly would be searched, their questions--whether the luggage belonged to the subjects, whether they had packed it, whether they knew what it contained--are the sort of standard inquiries permissible during an investigation. See Williams, 945 F.2d at 193.
 
 
 25
 Thompson concludes that the encounter crossed over the threshold and into the domain of investigatory detention when the officers began their inquiry about "large quantities of narcotics". The magistrate judge found that "once the accusing finger is pointed at the subject he will not reasonably feel free to leave." The cases upon which the Magistrate Judge relied in reaching this conclusion--Borys and United States v. Palen, 793 F.2d 853 (7th Cir.1986)--differ because the officers in those cases pointedly asked the defendants whether they had any drugs in their possession. Once the agents did so, they "positively identified [the subjects] as ... suspect[s]", Borys, 766 F.2d at 311, and the consensual encounters transformed into investigatory stops. But Williams makes clear that Borys and Palen are confined to circumstances in which agents explicitly tell the subject that he is a suspect. Williams, 495 F.2d at 197. In this instance, the agents never outright accused Thompson of being a suspected drug courier. In view of the circumstances, because a reasonable person would have felt free to leave, Thompson was not seized within the meaning of the Fourth Amendment.
 
 III
 
 26
 The district court's conclusion that Thompson was not seized is consistent with controlling law and is not erroneous, clearly or otherwise.
 
 
 27
 AFFIRMED.
 
 
 
 [1]
 For a sampling of other such cases, see United States v. Berke, 930 F.2d 1219 (7th Cir.), cert. denied, 112 S.Ct. 269 (1991); United States v. High, 921 F.2d 112 (7th Cir.1990); United States v. Johnson, 910 F.2d 1506, 1508 (7th Cir.), cert. denied 495 U.S. 1051 (1991)
 
 
 [2]
 Only if the encounter loses its consensual character is the Fourth Amendment triggered. Id. At that point, the interaction crosses into a different realm of Fourth Amendment jurisprudence and becomes a seizure. The investigatory stop, for instance, "is limited to brief, non-intrusive detention during a frisk for weapons or preliminary questioning." United States v. Black, 675 F.2d 129, 133 (7th Cir.1982). Since an investigatory (or "Terry") stop generally is less intrusive than an arrest, the officer need not have probable cause so long as he can point to "specific and articulable facts sufficient [to] give rise to reasonable suspicion that a person has committed a crime or is committing a crime." Id. We need not determine whether the agents had reasonable suspicion because we have previously held that Thompson consented to the encounter with the police