**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John W. EDDY, Defendant–Appellant.**

No. 92–4097.

United States Court of Appeals, Seventh Circuit.

Argued July 7, 1993.

Decided Oct. 29, 1993.

David E. Bindi, Barry R. Elden, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

John F. Murphy, Office of the Federal Defender Program, Chicago, IL (argued), for defendant-appellant.

Before COFFEY and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

COFFEY, Circuit Judge.

John W. Eddy pled guilty to one count of possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), and the district court sentenced him to 60 months' imprisonment. In this appeal, Eddy challenges the district court's denial of his motion to suppress evidence obtained during a search of his luggage at Union Station in Chicago. Eddy claims that the district court erroneously found the agents' testimony more credible than his testimony.

## I.

On February 4, 1992, members of a Drug Enforcement Agency ("DEA") task force were monitoring Union Station in Chicago. As part of the surveillance, Chicago Police Officer Thomas Kinsella and DEA Special Agent Gary Boertlein met train number 4 as it arrived from Los Angeles, a known point of entry for imported drugs. Tr. 5. The agents stood on the platform as the passengers disembarked. Tr. 5, 29, 74. According to the agents, defendant John Eddy was the first person off the train, Tr. 31, 67, though Eddy claims that several people got off before him, Tr. 104–05. Eddy, wearing sunglasses, caught the agents' attention because they thought he looked conspicuous: he was younger than most people who ride in the sleeper cars and was wearing a baseball cap and a San Jose Sharks jacket (indicating that he was not a business passenger). Tr. 6, 70. Eddy carried a large, tan, soft-sided canvass bag and a large, hard-sided suitcase. Tr. 7.

When he got off the train, he nervously looked up and down the platform and walked toward the south concourse area. Tr. 7. While walking, he looked back over his shoulder, as the agents started following him. Tr. 8. During this period, the agents observed Eddy continue to look around as he proceeded to the baggage claim area. Tr. 9, 70–71.

Although Eddy had no luggage to retrieve, he testified that he went to the baggage claim area because he wanted to inquire of an Amtrak employee where he might store his bags while he waited for a connecting train. Tr. 108. About 5–10 minutes later, Eddy left the baggage claim area and proceeded west across Union Station's main terminal (also called the "grand room" or "grand hall") to the parcel check-in window. Tr. 10, 111. The agents were interested in questioning him before he checked his bags, so they caught up with him about halfway across the terminal. Tr. 10–11, 48–49, 74.

The agents and Eddy give different versions of the ensuing encounter.

### The Agents' Version of the Encounter

The agents testified that they came up on Eddy's left, and Kinsella said, "Excuse me. I am a police officer. Can I speak with you for a moment?" Tr. 11. Eddy turned towards them, they displayed their badges, and Eddy said, "Sure." Tr. 11–12. Both agents testified that they were armed, though Kinsella stated that his weapon was in an ankle holster, Tr. 13, and Boertlein testified that his was tucked in the back of his pants, underneath a jacket. Tr. 74.

Initially, Kinsella asked if he could see Eddy's train ticket. And as Eddy retrieved his ticket from his canvass bag, his hands were visibly shaking. Tr. 14, 77. Kinsella examined the ticket, which had been issued in Eddy's name and was for round trip passage between Pasadena and Cincinnati. Kinsella asked Eddy where he boarded the train, and Eddy replied that he had boarded in San Jose. Kinsella asked him whether he was going to Cincinnati on business or on vacation; Eddy said business. Tr. 14, 77. Kinsella returned the ticket to Eddy and asked him what type of business he was in. Eddy replied that he was a car salesman, but later admitted that he was unemployed. Kinsella next asked him what type of business he was on if he was unemployed. Eddy stated that he was going to Cincinnati on vacation to visit some friends. Tr. 15, 77.

Kinsella sought additional identification and asked Eddy for a driver's license. Eddy instead produced a United States passport. The picture matched Eddy's appearance, and the passport, like the ticket, had been issued in Eddy's name. The passport bore a stamp indicating that Eddy had travelled to Colombia, South America, in 1990. Tr. 15, 55, 78. Kinsella returned the passport to Eddy. Tr. 15, 56. Once again Kinsella asked Eddy for his driver's license. Eddy gave him what appeared to be a California driver's license but was actually a California auto salesperson's license. Tr. 15–16, 56, 78. Kinsella observed that the typeset of the license number appeared somewhat different from the other printed material. He returned the document to Eddy. Tr. 16, 78.

At this time Eddy inquired about the reason for the interrogation, and Kinsella replied that they were conducting a narcotics investigation. They explained to him that he was not under arrest, that he was free to leave, but that they would like to ask him a few more questions. Tr. 16, 79–80. Eddy said, "Okay." Tr. 17. In response to the additional questions, Eddy stated that the luggage he was carrying was his, that he had packed it himself, and further that he knew its contents. Kinsella then asked if Eddy would consent to a search of the luggage, and at the same time informed him that he had a right not to consent to the search. Tr. 17, 80. Eddy agreed to the search, but requested that it be conducted somewhere else. The agents agreed, and Eddy picked up his bags and walked to the west wall of the main terminal, about 20 feet away. Kinsella again asked Eddy if he was giving his consent to the search, and Eddy stated that he was. Tr. 17–18, 81. Kinsella began searching the bags. Boertlein testified that he made small talk with Eddy to maintain a relaxed atmosphere. Tr. 81. According to Kinsella, Boertlein remained silent until the arrest. Tr. 53. When the search of Eddy's luggage revealed a quantity of both marijuana and cocaine, the agents placed Eddy under arrest. Tr. 18–20, 82–83.

### Eddy's Version of the Encounter

Eddy maintained that the agents approached him when he was about 20 feet from the parcel storage area and tapped him on the shoulder. When he turned around, he observed the two agents displaying their badges. Kinsella was in front of him, while Boertlein was to his left and behind him a little bit. Tr. 112–13. Eddy noticed that Boertlein was armed. Tr. 130–31. Kinsella told Eddy that they were DEA agents and that they were doing an ongoing investigation concerning the trafficking of narcotics in the train station. Kinsella asked Eddy if he came off the train from Los Angeles, and Eddy admitted he had. Tr. 114. Kinsella never inquired where in California he had come from. Tr. 115. Kinsella told Eddy

that they had reason to believe that a large shipment of drugs was coming in on that train. Tr. 114.

Kinsella asked to see some identification. Eddy produced his passport and his car salesperson's license and handed them to Boertlein who began looking at them. Tr. 114–15, 132. Kinsella next asked to see Eddy's train ticket, and Eddy turned it over to him. Tr. 114–15. Kinsella then handed the ticket to Boertlein, who seemed to compare the ticket with Eddy's identification. Boertlein told Kinsella that they matched, but neither his identification nor his ticket was ever returned to him. Tr. 116–17.

Kinsella then asked Eddy if he had ever been arrested. Eddy said, "No, I haven't." Kinsella commented that this incident must be pretty scary for Eddy, and Eddy said that it was. Eddy then asked Kinsella what this was all about. Kinsella told Eddy, "We want to search your bags." Tr. 118. Eddy said, "Okay." Tr. 120. Kinsella never used the word "consent," he did not tell Eddy that he had a right to refuse, nor did he tell Eddy that he had a right to refuse to answer any of their questions. Tr. 118–19. Eddy did not feel free to leave because they had his passport, his car salesperson's license, and his train ticket. Tr. 119–20. Kinsella searched his luggage at the same location where they first stopped Eddy. He found a couple of bags (Eddy does not say what the bags contained), at which time Eddy asked if they could do this somewhere else. They said, "Sure," and took him upstairs. Tr. 120–21. During the entire encounter in the main terminal, the agents never inquired about his employment. Tr. 117.

### District Court Proceedings

Eddy filed a motion to suppress the evidence. The motion claimed that Eddy was seized in Union Station and that the seizure was unlawful because the agents had neither probable cause nor reasonable suspicion to believe that he had committed or was committing an offense. R. 17. In his memorandum in support of the motion to suppress, Eddy argued in the alternative that, even if there had been no seizure, the evidence should be suppressed because he had not voluntarily consented to the search of his luggage. R. 23, at 32–33. The district court held a suppression hearing on June 10, 1992.

The court issued a memorandum opinion and order dated July 20, 1992, denying Eddy's motion to suppress. In short, the court determined that the encounter in the main terminal was consensual. The court rejected Eddy's version of the events, finding the agents' version more credible. R. 27. The court sentenced Eddy to 60 months' imprisonment, R. 34, and Eddy filed a timely notice of appeal. R. 35. On appeal, Eddy claims that the district court's credibility determinations were clearly erroneous.

### II.

■ The denial of a motion to suppress evidence is reviewed deferentially. *United States v. Evans,* 994 F.2d 317, 320 (7th Cir. 1993). An appellate court will reverse only if the district court's decision was clearly erroneous. *United States v. Spears,* 965 F.2d 262, 269 (7th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 502, 121 L.Ed.2d 438 (1992). When the district court's decision rests on credibility determinations, this court has stated that "the trial judge's ... choice of whom to believe is conclusive on the appellate court unless the judge credits *exceedingly* improbable testimony." *United States v. Cardona–Rivera,* 904 F.2d 1149, 1152 (7th Cir.1990). In other words, "[w]e must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *United States v. Saunders,* 973 F.2d 1354, 1359 (7th Cir.1992).

■ Eddy argues that his testimony was credible while the agents' testimony "was thoroughly pocked with inconsistency and incongruity." Br. 20. The "core inconsistency," according to Eddy, is the agents' insistence that when they approached him, their intent was to question him, while in reality they wanted to search his luggage. The government freely acknowledges that the agents wanted to search Eddy's luggage and that they hoped that he would consent to it. Br. 9–10. The problem with Eddy's position is that it assumes the agents could have only

one of two motives, i.e., to question Eddy or to search his bags. Clearly, they could have wanted to do both things. The agents testified that they wanted to talk to Eddy, but we find no place in the record where they were directly asked whether they hoped to search his bags before the encounter. Eddy's trial counsel should have asked the agents this question on cross-examination, for whether the agents intended to search Eddy's bags from the moment they observed him certainly was relevant to whether the agents' encounter with Eddy was consensual. Nevertheless, since the record reflects that the agents never stated that they intended to search Eddy's bags from the moment they observed him, there is no inconsistency in the agents' testimony that would call their credibility into question.

Eddy next argues that Kinsella's credibility was undermined by his testimony that Eddy told him that he (Eddy) had boarded the train at San Jose even though his ticket indicated that he boarded the train at Fresno. This is of no consequence, however, for the government's position was that the agents' encounter with Eddy was consensual and hence required no suspicion on the part of the agents. As such, Kinsella would have no reason to fabricate this detail in order to create a reasonable suspicion that would justify an investigatory detention. Moreover, Kinsella testified on cross-examination that he did not know where San Jose and Fresno were located in California. Tr. 51–52. For all he knew, one could have been the suburb of the other. Tr. 51. There is no reason Kinsella would have offered this testimony if he had been trying to establish a reasonable suspicion.

■ Eddy also finds incredible Kinsella's testimony that he returned to Eddy what he thought was an altered California driver's license. Yet as Eddy himself agrees, if Kinsella had not returned the license to Eddy, then this might have turned the encounter into a seizure. Because Kinsella was part of a narcotics task force interested in intercepting the distribution of narcotics, it is not inherently unbelievable or improbable that Kinsella would return to Eddy what he believed was an altered driver's license. We therefore do not agree with Eddy's contention that the district court clearly erred by accepting the agents' testimony that Kinsella returned the license to Eddy.

■ Eddy makes much of the agents' testimony that Kinsella on two separate occasions asked for consent to search Eddy's luggage, the second time after Eddy allegedly moved the luggage over to the wall of the main terminal. Eddy, without any explanation, speculates that no agent would dare jeopardize the initial consent by asking for permission to conduct a search for a second time. The government maintains, however, that an interruption between the giving of consent and the execution of a search can cause courts to question whether the consent remains valid. As an example, the government cites *United States v. Sterling*, 909 F.2d 1078, 1080 (7th Cir.1990), a case in which the defendant changed her mind about giving consent after making a phone call. Even if the defendant does not explicitly withdraw previously given consent as in *Sterling*, the courts might find that the defendant withdrew his or her consent based on the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). Thus, it is certainly prudent, and not inherently unbelievable, for a law enforcement agent to seek confirmation when there is an interruption following the giving of consent.

■ Next, Eddy argues that the agents undermined their credibility by contradicting themselves because Boertlein claimed to have made small talk with Eddy during the search of his bags while Kinsella testified that Boertlein did not say anything at the time. We agree with the government's position that this is a minor discrepancy.[1] It is

---

1. The government suggested at oral argument that there might not be any discrepancy at all arising from Officer Kinsella's testimony that he did all the questioning of Eddy. The government interprets Kinsella's testimony to mean that Kinsella did all the questioning *of any consequence,* which would be consistent with Boertlein's testimony that he tried to engage Eddy in small talk. This attempt to reconcile the agents' testimony fails because Kinsella testified both on direct and cross-examination that Boertlein said nothing at all during the encounter until after they arrested

quite possible that Kinsella did not hear Boertlein because of the noise created by the hustle and bustle in the main terminal of the train station, which had hundreds of people in it, Tr. 12, 130, or possibly because Kinsella was concentrating on searching the bags. This type of minor inconsistency is insufficient to render clearly erroneous the district court's denial of the motion to suppress. *See United States v. Harty,* 930 F.2d 1257, 1266 (7th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 262, 116 L.Ed.2d 215 (1991).

■ Eddy also focuses on a discrepancy between Boertlein's written report on the encounter and the agents' testimony. The agents testified that Kinsella advised Eddy that he had a right to refuse to consent to the search of his bags, Tr. 17, 96, yet Boertlein's report makes no mention of this, Tr. 96–97. Eddy suggests that "[t]he obvious explanation for the inconsistency is that Kinsella never informed Eddy that he had a right to refuse the search." Br. 24. The government argues that a judge is not "automatically foreclosed from crediting the testimony of an agent who asserts a fact not included in his or her written report." Br. 13. We agree with the government's position. Eddy cites no case holding that errors of omission in report-writing make testimony as to the fact omitted incredible as a matter of law. Indeed, such a holding would be of questionable merit. A law enforcement agent's written report is not an all-encompassing account of exactly what was said and done during an encounter between a law enforcement agent and a private citizen, but rather is a summary of what occurred. With that in mind, we agree with the experienced trial judge that Boertlein's failure to mention in his written report that Kinsella admonished Eddy that he could refuse to consent to the search does not render incredible Kinsella's testimony that he so admonished Eddy. *See United States v. Evans,* 994 F.2d 317, 321–22 (7th Cir.1993) (recognizing that absence of indication in police report of fact supporting police officers' testimony may impact on credibility of officers' testimony, but

refusing to disturb district court's finding that officers' testimony was credible). Moreover, Kinsella did not help Boertlein prepare the written report. Tr. 21. Kinsella examined the completed report for the first time at a pretrial meeting but did not notice that it failed to state that he advised Eddy of his right to refuse to consent to the search. Tr. 21–22. It does not seem "*exceedingly* improbable" that Boertlein inadvertently omitted the fact that Eddy was told of his right to refuse to consent to a search, and Kinsella failed to notice the omission when he examined the report. Because the agents' version of what transpired is not "*exceedingly* improbable," the judge's decision of whom to believe is not clearly erroneous.

Eddy next tries to analogize the credibility determination facing the judge in this case to the one present in *United States v. Williams,* 945 F.2d 192 (7th Cir.1991). In *Williams,* the judge refused to believe the defendant when her testimony at the suppression hearing varied from an affidavit that she had prepared earlier. In the affidavit, the defendant had stated that there might be a gun, but she testified at the hearing that there was a gun. *Id.,* at 195. This court concluded that the trial judge's credibility determination was not clearly erroneous.

■ Eddy's reliance on *Williams* is misplaced. First, simply because the judge in *Williams* found significant a discrepancy between the defendant's affidavit and her testimony does not mean that the judge in this case (or, for that matter, the judge in any case) *must* find significant a discrepancy between the omission from Boertlein's report and the agents' testimony. It is up to the trial judge to make the credibility determination. The trial judge "has the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appel-

Eddy. Tr. 18–20, 53. Thus, there is an inconsistency in the agents' testimony, though, as we shall explain, it is minor.

late record." *United States v. Tolson,* 988 F.2d 1494, 1498 (7th Cir.1993) (quoting *Churchill v. Waters,* 977 F.2d 1114, 1124 (7th Cir.1992)). Here the trial judge was in a better position than we are to assess whether the agents were being truthful. Second, even if the agents' credibility was somewhat undermined by the discrepancy, Eddy himself was not free from impeachment. He stated that he was traveling on business, then contradicted himself by saying he was on vacation. Eddy maintains that this reasoning is circular because it is based on the agents' version of the conversation: that one must first credit the agents' version before one can accept that Eddy contradicted himself. The government responds that it was reasonable for the district judge to credit this aspect of the agents' testimony because it is more plausible that the agents would ask about Eddy's travel plans and employment history during the initial stop than after he was arrested (as Eddy claimed). Eddy's only response in his reply brief is that the government "would acknowledge that agents frequently get background information of a subject after an arrest." Reply Br. 6. Even if Eddy is right, it is at least as plausible to conclude that agents seek such information during the initial encounter rather than after the arrest. After all, the agents must gather sufficient background information on the subject before the arrest to assure themselves that they have the right person. The judge's decision to credit the agents' version was not clearly erroneous and hence does not conflict with *Williams.*

■ Eddy contends, in short, conclusory sentences without any reasoning or supporting caselaw, that his credibility was bolstered by his testimony that Boertlein had a gun, a fact that Boertlein admitted. He also finds it significant that he did not raise this on direct examination but rather on cross examination in response to questions by the government—presumably, if he were making it up, he would have trumpeted this fact on direct examination in an effort to make the encoun-

ter appear coercive. Nevertheless, even if Eddy saw Boertlein's gun, there remains the inconsistency on Eddy's part concerning the purpose of his trip: Eddy initially told the agents that he was traveling to Cincinnati on business, Tr. 14, 77, but later changed his story, admitting that he was unemployed and that he was going to Cincinnati to visit some friends. Tr. 15, 77. Thus, the judge's credibility determination was not clearly erroneous.[2]

Finally, Eddy claims that his consent to search his bags was the result of subtle police coercion. The government maintains that this issue is not properly before the court because it was not raised in Eddy's motion to suppress. Eddy argued the issue in his brief in support of his motion to suppress, and the district court addressed it, so we can address it as well. The problem is that Eddy's argument is virtually non-existent. He states that:

The credible evidence presented below supports the reality that John Eddy was subjected to subtle police coercion in Union Station. To the extent, if any, that he was informed of his rights, this information was inadequate to overcome the stealthy, artful manner in which he was stopped.

Br. 27. Aside from a few quotes stating the applicable law, this is the full extent of Eddy's argument that his consent was not truly voluntary. This argument is inadequately developed and hence waived. *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 141, 116 L.Ed.2d 108 (1991).

### III.

■ The credibility determinations upon which the district court based its denial of Eddy's motion to suppress evidence were not clearly erroneous. Therefore, the judgment of the district court is AFFIRMED.

---

2. Eddy also argues that he deserved a more thorough analysis than the district court provided in its decision to deny his motion to suppress. Our ability to review the court's credibility determinations was not impaired, so we will not re-

mand this case, especially in light of the fact that Eddy did not ask the district court for clarification of its reasons, nor did he press this issue in this court until his reply brief.