In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 05-4277

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MIGUEL OCAMPO,

*Defendant-Appellant*.

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 79—**Elaine E. Bucklo**, *Judge*.

———————

ARGUED DECEMBER 7, 2006—DECIDED JANUARY 8, 2007

———————

Before BAUER, MANION, and SYKES, *Circuit Judges*.

BAUER, *Circuit Judge*. Miguel Ocampo pleaded guilty
to distributing 52.1 grams of methamphetamine in vio-
lation of 21 U.S.C. § 841(a)(1) and possessing a firearm
with a removed serial number in violation of 18 U.S.C.
§ 922(k). In calculating his Advisory Guidelines sentenc-
ing range, the district court imposed a two-level enhance-
ment for using a firearm during the offense and declined
to reduce the sentence for cooperation. The district
court sentenced Ocampo to 108 months' imprisonment,
which he now appeals. We affirm.

## I.  Background

On December 7, 2004, Ocampo met an undercover government cooperating source ("CS") at Ice Bar in Chicago, Illinois, where Ocampo sold the CS 13.9 grams of crystal methamphetamine.

On January 12, 2005, Ocampo agreed to provide the CS with an additional two ounces of crystal methamphetamine. That night in a series of recorded conversations, Ocampo informed the CS that he was in Skokie, Illinois and the transaction would be delayed due to traffic. He told the CS that he had to go home to retrieve the methamphetamine. When the CS indicated that her fictitious customer was impatient, Ocampo suggested they meet at Ocampo's home. Instead, Ocampo and the CS agreed to meet in a couple hours at Ice Bar. Undercover agents then followed Ocampo to his home before he arrived at the bar. There, he spoke to the CS and an undercover Drug Enforcement Administration task force officer. Eventually the transaction occurred across the street at a restaurant.

Pursuant to a warrant, DEA agents arrested Ocampo at his residence in Cicero, Illinois on January 27, 2005. Agents recovered a Intratec Tec-22 weapon with a removed serial number, a banana clip, and twenty-six rounds of ammunition from the dresser drawer of his bedroom. In the same dresser drawer, agents found a loaded .40 caliber Taurus semiautomatic handgun, a handheld digital scale, and two small plastic bags with quantities of a controlled substance. In an adjacent dresser drawer, agents found a first-aid kit containing drug paraphernalia, drug packaging materials, and clear plastic ziploc bags. On the bedroom floor, agents found a handheld police scanner and a police call frequency guide book. Agents also found small amounts of marijuana, methamphetamine, brown heroin, and numerous pipes.

On top of Ocampo's dresser was a drug ledger listing his customers, including the CS, and the dollar amounts that those customers owed him. The search also uncovered a surveillance camera hidden in a birdhouse outside his residence with a live feed to a television in Ocampo's bedroom.

On April 6, 2005, a grand jury indicted Ocampo with knowingly and intentionally distributing methamphetamine in excess of 5 grams in violation of 21 U.S.C. § 841(a)(1); knowingly and intentionally distributing methamphetamine in excess of 50 grams in violation of 21 U.S.C. § 841(a)(1); and knowingly possessing a firearm which had the manufacturer's serial number removed, obliterated, or altered in violation of 18 § U.S.C. 922(k). Ocampo pleaded guilty and acknowledged that he went home to get the drugs.

At the sentencing hearing, several agents testified to the above facts. Ocampo asserted, however, that the weapon in his home was not involved in the offense because he maintained that the drugs were not at his home. Additionally, Ocampo argued for a downward departure in sentencing for his previous cooperation with authorities. Ocampo testified that drug sales were his sole means of livelihood and that he would use two to five grams of crystal methamphetamine a day to support his addiction. He testified that he only kept personal use quantities of drugs at his home and the plastic bags were to portion out his personal use of drugs. He also admitted that he used the digital scale found in his bedroom to weigh the drugs that he sold to his customers but insisted that he weighed the grams in his truck or at a nearby motel. He stated that on this occasion, his source in Skokie loaned him two ounces of crystal methamphetamine for the CS. Ocampo said he then went home to get high but at other times he would also get high at Ice Bar. He testified that after he returned home from Skokie,

while he was inside his home, he left the drugs for the CS under the driver's seat of his truck.

Ocampo explained that two months prior to his arrest, he took the Intratec Tec-22 weapon and ammunition from another drug dealer when the dealer was under the influence of drugs and acting dangerously. Ocampo also stated that two days prior to his arrest, a different drug dealer, Pedro Martinez, dropped off the .40 caliber Taurus semiautomatic handgun at his apartment and the clip fell out of the gun.

Ocampo participated in a proffer session with the government in which he identified other narcotics dealers, including Pedro Martinez, who was also identified by a cooperating source. Ocampo's girlfriend cooperated with the government in its investigation of Martinez by working as a confidential source in an effort to benefit Ocampo's case. The parties stipulated that Ocampo rejected an offer to postpone his sentencing hearing in order to allow him and his girlfriend to complete their cooperation with the government.

At sentencing, the district court determined that Ocampo's total offense level was 31. This included a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1) because the offense conduct involved the possession of a dangerous weapon and a three-level reduction for his timely acceptance of responsibility. The district court found that it was more likely than not that Ocampo had the drugs at his home, thus it was not "clearly improbable that the weapons [were] connected with the offense." See U.S.S.G. § 2D1.1(b)(1) and Application Note 3. The district court determined that Ocampo had a criminal history category I, resulting in an advisory guideline range of 108-135 months. The court declined a reduction for cooperation, sentencing Ocampo to 108 months' imprisonment. Ocampo timely filed this appeal.

## II. Analysis

In the post-*Booker* era, we continue to review the district court's factual findings at sentencing for clear error and the application of those facts to the Sentencing Guidelines *de novo*. *United States v. Haddad*, 462 F.3d 783, 793 (7th Cir. 2006).

Ocampo challenges the district court's conclusion that a weapon was used in the offense based on its determination that the drugs were at his home. Ocampo contends that the government failed to demonstrate that the weapon was either present or connected to the offense. We disagree.

It is uncontroverted that Ocampo had been in possession of the Intratec Tec-22 weapon at his home for approximately two months prior to his arrest. Ocampo does not dispute that he declared his intention to retrieve the methamphetamine from his home. Moreover, the evidence of drug distribution at Ocampo's home was overwhelming. In evaluating evidence, trial judges are responsible for credibility determinations. *United States v. Eddy*, 8 F.3d 577, 583 (7th Cir. 1993). Here, the district court weighed the credibility of the witnesses and rejected Ocampo's testimony. We find the district court properly determined that the weapon was connected to the offense.

Ocampo also asserts that the district court erred by failing to give Ocampo credit for the cooperation he provided to the government. The district court did not overlook Ocampo's cooperation with the government; rather, the district court properly considered both Ocampo's past cooperation and his current unwillingness to cooperate before concluding that it was not substantial and did not warrant a reduction. We find that the district court did not err in rendering this conclusion.

### III.  Conclusion

Accordingly,  the  judgment  of  the  district  court  is
AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*