In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 01-1858 & 01-2333

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

TERRANCE MCCLURGE
and RENEIKO CARLISLE,

*Defendants-Appellants*.

———————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 929—**James B. Moran**, *Judge*.

———————

ARGUED DECEMBER 5, 2001—DECIDED NOVEMBER 27, 2002

———————

Before COFFEY, EASTERBROOK, and RIPPLE, *Circuit Judges*.

COFFEY, *Circuit Judge.* On November 10, 1999, a jury found defendants McClurge and Carlisle guilty of kidnapping, conspiracy to commit kidnapping, and using a firearm during the commission of a crime of violence.[1] Defendant McClurge challenges his conviction and argues on appeal that the trial court abused its discretion: (1) by not granting his motion for severance; (2) by refusing to

---

[1] A third defendant, Alvertis McClurge, (a cousin of Terrance McClurge) was acquitted.

strike testimony of the prosecution's key witness; and (3) by failing to grant a new trial or evidentiary hearing based on newly discovered evidence. Defendant Carlisle likewise challenges his conviction, joining in McClurge's second argument; namely, that he was denied his Sixth Amendment right to confront his accuser when the district court allowed the prosecution's witness to invoke his Fifth Amendment rights. We affirm.

## I. FACTUAL BACKGROUND

### A. *The Kidnapping*

Just after midnight on December 8, 1998, a Chicago-area drug dealer, Terrance McClurge ("McClurge"), aided by two accomplices, Reneiko Carlisle ("Carlisle") and Tywon Cannon ("Cannon"), abducted Raymond Lewis ("Lewis") at gunpoint in Maywood, Illinois. Lewis was the brother-in-law of Allen Jimmerson ("Jimmerson"), a Chicago resident who supplemented his income as a gospel music producer with sales of illegal narcotics to dealers such as McClurge.

A few months before Lewis's abduction, McClurge had become disenchanted with Jimmerson and made plans to kidnap either Jimmerson or someone close to him. Cannon, who had pled guilty and testified at the defendants' trial pursuant to a plea agreement, claimed that McClurge drove the black Lexus used in the kidnapping, that Carlisle had forced Lewis into the back seat of the car, and that Cannon himself had brandished a gun to frighten Lewis into submission.

Once the four men were inside the vehicle, Carlisle handcuffed Lewis and covered his mouth and eyes with duct tape. The kidnappers drove to the residence of McClurge's mother, where Lewis was escorted into a detached garage at the rear of the property. While Carlisle

remained with Lewis in the garage, McClurge and Cannon drove to a nearby gas station to make the first of several phone calls demanding cocaine and money in exchange for Lewis's safe return. McClurge dialed Jimmerson's home phone number and handed the receiver to Cannon as he was of the opinion that Lewis's family members might recognize his voice.

Throughout the day of December 8th, McClurge and Cannon drove around the south side of Chicago making phone calls to Jimmerson attempting to arrange for a ransom payment. McClurge dialed the phone for each of the calls, passed the cell phone to Cannon, and told Cannon what to say. Later that day, after McClurge took Cannon home, McClurge recruited another of his friends, Marcus Marks ("Marks"), to assume the role of negotiator between the victim's family and the kidnappers.

Throughout the evening of December 8, McClurge and Marks drove around Chicago's south side placing phone calls to Jimmerson. On this trip they were accompanied by Marks's friend, Antwon Eiland ("Eiland"). Several of these calls were made from cell phones belonging to Marks and Eiland. By this time, FBI agents had been called in to assist the Maywood Police and had set up telephone recording equipment at the Jimmerson residence. After numerous phone calls, eight of which were recorded by the FBI, McClurge, through Marks, told Jimmerson that he was becoming suspicious that the police had become involved and that negotiations would be ended for the night.

Late in the evening of the next day, December 9, McClurge told Marks that Lewis had to be moved out of the Chicago area. Marks agreed, but then withdrew from the plan after his mother voiced her objection to this proposed interstate travel with McClurge. McClurge, ac-

companied by his cousin, Alvertis McClurge ("Alvertis"),[2] transported Lewis to Jackson, Michigan. They arrived at the residence of McClurge's girlfriend in the early morning hours on December 10. Lewis was taken to the basement of the home, where he was watched while under the supervision of Alvertis. Alvertis testified at trial that he became involved and took care of Lewis only after being threatened by McClurge at gunpoint.

Back in Chicago, FBI agents had identified Marks and Eiland as the owners of the cellular phones used to make the ransom calls, and both men were arrested in the early morning hours of December 10. Marks confessed to his role in the crime and offered to lead agents to the home where Lewis was being held in Jackson, Michigan. While Marks and two FBI agents were en route to Michigan on the morning of December 11, McClurge decided to release Lewis. McClurge helped Lewis (whose eyes and mouth were still covered with duct tape, but whose hands had evidently been removed from the handcuffs) out of the basement, drove him to Detroit, and dropped him off in the vicinity of an AMTRAK station. Lewis, after managing to free himself from the duct tape that bound him, called a friend in Chicago from a pay phone at the station who in turn notified the police of Lewis's location. FBI agents picked up Lewis and interviewed him.

The criminal investigation of the kidnapping produced several pieces of evidence inculpating McClurge, including: (1) fibers taken from Lewis's clothing matched those of carpet in the home of McClurge's girlfriend in Jackson, Michigan (to which McClurge had brought the victim); (2) the ends of the duct tape used to bind Lewis matched precisely the ends on a role of duct tape seized from

---

[2] As noted *ante*, this opinion refers to Terrance McClurge as "McClurge" and to his cousin, Alvertis McClurge, as "Alvertis."

McClurge 's bedroom; and (3) a gold necklace belonging to Lewis was recovered from the back of a car registered to McClurge's mother in which Lewis had at one time been confined.

## B. *The Criminal Proceedings*

On August 26, 1999, a grand jury in the Northern District of Illinois returned a three-count superseding indictment against McClurge, Carlisle, and Alvertis. Counts one and two charged the three men with kidnapping and conspiracy to commit kidnapping, in violation of 18 U.S.C. §§ 1201(a)(1)-(2), (c). Count three charged McClurge and Carlisle with using, carrying, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1). Marks and Cannon entered pleas of guilty to charges of conspiracy to commit kidnapping and agreed to testify for the government pursuant to a plea agreement.

Prior to trial, McClurge moved for severance of his trial from that of his co-defendant Alvertis, arguing that as McClurge and Alvertis would be presenting mutually exclusive defenses that might inculpate one another, both theories of defense could not be accepted by the jury. McClurge's theory of defense was that he was not involved in the kidnapping, while Alvertis's defense was to admit his participation in the kidnapping, but to argue that McClurge forced him at gunpoint to participate. McClurge's attorney renewed his severance motion the morning of trial, several times throughout the trial, and again at the conclusion of testimony. On each occasion the district court denied the motion relying on the Supreme Court's holding in *Zafiro v. United States*, 506 U.S. 534 (1993), which held that the fact that defenses may be "antagonistic" does not, of itself, necessitate severance, and furthermore that McClurge had offered no more than that his and Alvertis's defenses would be antagonistic.

At trial, Marks testified about his knowledge of the events surrounding the kidnapping and the participation of the defendants McClurge, Carlisle and Alvertis. On cross-examination, Marks invoked his Fifth Amendment right against self-incrimination in response to a total of four questions, posed by attorneys representing McClurge and Carlisle, concerning his relationship with Eiland (the friend who rode in the car with Marks and McClurge the evening of December 8 and the owner of one of the cellular telephones referred to heretofore as being used to make the ransom calls).[3] The judge sustained objections to these questions and later denied a motion to strike Marks's testimony.

The first time Marks invoked his Fifth Amendment right was during his cross-examination by Carlisle's attorney. When asked "Well, you have seen him [Eiland] kill somebody, haven't you?," Marks took the Fifth. The district court responded by instructing counsel to move forward with a different line of questioning. The other three times Marks refused to answer arose during cross-examination by counsel for McClurge. While Marks answered most of the questions posed to him, he pleaded the Fifth to the following three questions: (1) "[Y]ou covered up crimes for Antwon Eiland before, haven't you?"; (2) "[Y]ou and Antwon Eiland have engaged in other kidnappings, haven't you?"; and (3) "What about that shooting, did you cover up for him then?" The government objected to the line of questioning and the objection was sustained by the trial judge.

The jury found McClurge and Carlisle guilty on all three counts of the indictment and acquitted Alvertis of all charges. After the verdict, but prior to sentencing, Mc-

---

[3] Eiland was not charged with any crime in connection with the kidnapping.

Clurge filed a motion for a new trial on the basis of newly discovered evidence, arguing that he had learned after trial that Marks, the government's witness, was a suspect in an unrelated investigation concerning the murder of a drug dealer, and that this information potentially relating to the impeachment of a key witness should have been made known to the defendant. The trial court denied the motion for a new trial on the grounds that the information had been known to McClurge prior to trial (and thus was not "newly discovered") and that the information, even if considered "newly discovered," would not have had a conceivable bearing on the outcome of the trial.

McClurge was subsequently sentenced to concurrent terms of 360 months on counts 1 and 2, and a consecutive term of 60 months on count 3. Carlisle was sentenced to concurrent terms of 195 months on counts 1 and 2 and a consecutive term of 60 months on count 3. McClurge and Carlisle appeal.

## II. DISCUSSION

McClurge makes three arguments on appeal: (1) the trial court abused its discretion by not granting the severance motion; (2) Marks's invocation of his Fifth Amendment right against self-incrimination and the district court's related limitation of the scope of cross-examination violated his constitutional right to confront witnesses; and (3) the district court abused its discretion when it denied his motion for a new trial based on "newly discovered evidence." Carlisle's appeal raises only the issue of the court's denial of his motion to strike Marks's testimony after Marks invoked his Fifth Amendment rights on cross-examination.

### *A. Motion for Severance*

McClurge argues that the trial court abused its discretion by refusing to sever his trial from that of his co-defendant Alvertis because of the "mutually antagonistic defense" presented by Alvertis. Specifically, McClurge argues that a jury could not accept both his defense and Alvertis's defense to the kidnapping charges, because acceptance of one required the rejection of the other. McClurge's defense theory was that he was not involved in the kidnapping; Alvertis's defense, meanwhile, was premised on the theory that McClurge had coerced Alvertis into participating at gunpoint.

We review the trial court's decision to deny a motion to sever trials for abuse of discretion. *United States v. Mietus*, 237 F.3d 866, 873 (7th Cir. 2001). In conspiracy cases, "there is a strong interest in trying defendants who have been jointly indicted in a single trial." *United States v. Blassingame*, 197 F.3d 271, 286 (7th Cir. 1999) (holding that one trial applicable to each defendant is preferred over two because joint trials reduce the burdens on the judiciary, prosecutors, and witnesses, because of the extra expenses incurred in two trials, and because they reduce the chance that each defendant will attempt to create reasonable doubt by blaming an absent coconspirator). In all but the "most unusual circumstances," the risk of prejudice arising from a joint trial is "outweighed by the economies of a single trial in which all facets of the crime can be explored once and for all." *Id.* (quotation omitted).

McClurge initially argues that severance is required whenever the defense theory of one defendant contradicts the defense of another defendant in such a way that the jury's acceptance of one defense precludes acceptance of the other. McClurge's argument is supported neither by logic nor case law. First, McClurge's defense and Alvertis's

defense were not "*mutually* antagonistic." While Alvertis's was hostile to McClurge's, the converse was not true. Second, even if we were to assume the defenses were "mutually antagonistic," McClurge's theory runs contrary to the law of this circuit. As has been made clear on several occasions, the presentation of mutually antagonistic defenses "is not sufficient grounds to require severance" of trials:

> There is a preference in the federal system for joint trials of defendants who are indicted together. A district court should grant severance . . . only if the joint trial "compromise[d] a specific trial right of one of the defendants, or prevent[ed] the jury from making a reliable judgment about guilt or innocence." [quoting *Zafiro*, 506 U.S. at 538-39.] *Even a showing that two defendants have "mutually antagonistic defenses," that is, that the jury's acceptance of one defense precludes any possibility of acquittal for the other defendant, is not sufficient grounds to require a severance unless the defendant also shows prejudice to some specific trial right.*

*Mietus*, 237 F.3d at 873 (emphasis added). *See also United States v. Wilson*, 237 F.3d 827, 835-36 (7th Cir. 2001), *cert. denied*, 122 S. Ct. 97 (2001); *United States v. Ramirez*, 45 F.3d 1096, 1100-01 (7th Cir. 1995).

McClurge's next argument is that he was "unduly prejudiced" by Alvertis's coercion defense, in that two items of "evidence" were elicited during testimony that would have been inadmissible in a trial of McClurge alone. The first item to which McClurge objects is a statement, elicited by Alvertis's attorney during his cross-examination of co-defendant Cannon, that Cannon had told the FBI that he had once "done time" for McClurge. The judge allowed the question, over an objection by McClurge's attorney that it was impermissible character evidence, on the grounds

that it simply showed Cannon's "prior involvement with McClurge [and] with drugs." The trial transcript clearly demonstrates that McClurge's attorney (despite his objection) never requested a limiting instruction, and the question was allowed, with the judge reminding the jury "that there are no charges involving drugs in this case," and that the testimony was being allowed "for other purposes."

This ruling is reviewed under an abuse of discretion standard. *See Okai v. Verfuth*, 275 F.3d 606, 610 (7th Cir. 2001). "The district court's determination of the admissibility of evidence is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." *United States v. Denberg*, 212 F.3d 987, 992 (7th Cir. 2000) (quotation omitted). Here, where the record reflects that the judge specifically limited the scope of cross-examination on this point to a single question concerning Cannon's "prior relationships" upon a proper motion by the defendant, we will not disturb the trial court's discretion.

The second item of "evidence" to which McClurge objects is a reference, by Alvertis's attorney in his closing argument, to an FBI report that summarized an interview between FBI agents and Alvertis. The prosecution used this report when cross-examining Alvertis in an effort to establish that Alvertis's trial testimony differed from his statements to the FBI. In his brief, McClurge claims the reference to the report in the closing argument introduced "improper lawyer testimony" and "inadmissible hearsay" into McClurge's trial. As McClurge's counsel did not object to the FBI report during Alvertis's cross-examination or during the closing argument by Alvertis's lawyer, we review the judge's allowing the reception of the statement in evidence under the "plain error" standard of review.

*United States v. Olano*, 507 U.S. 725, 732 (1993). Upon review, we are convinced that the comments made by Alvertis's attorney were a proper comment on the lack of impeachment value contained in the FBI report that had been used to cross-examine his client and that the district judge did not commit error when he granted permission for the statement to be made.

Even were we to find that the trial judge erred when denying McClurge's severance motion, the law is clear that misjoinder of defendants can be harmless error if the jury was appropriately instructed to give "separate consideration to each individual defendant and to each separate charge against him," *Zafiro*, 506 U.S. at 541, and if the evidence against the defendant complaining of joinder was "overwhelming." *See United States v. Todosijevic*, 161 F.3d 479, 485 (7th Cir. 1998) ("Our decision [affirming] joinder allows us to dispense with [the defendant's] claim that the trial judge erred when he denied [the] motion to sever.") In the present case, the trial judge properly instructed the jury as follows:

> You will note that in the instructions I often refer to "the defendant you are then considering," and that is because each count of the indictment charges each defendant with having committed a separate offense. Each count and the evidence relating to it should be considered separately . . . . Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to any other count. Your verdict of guilty or not guilty of an offense charged against one defendant should not control your decision as to any other defendant.

(Tr. at 1658-59.) The jury instruction directs the jury that with assessment of guilt, the jury must find each and every defendant not guilty or guilty beyond a reasonable doubt as to each element of the crime charged. Such

an instruction "suffice[s] to cure any possibility of prejudice" presented by mutually antagonistic defenses because juries "are presumed to follow their instructions." *Zafiro*, 506 U.S. at 540-41. We are convinced that the district court did not abuse its discretion in denying McClurge's motion for severance.

### B. Marks's Invocation of the Fifth Amendment

McClurge and Carlisle argue that the district court abused its discretion when it denied their joint motion to strike Marks's direct testimony. The appellants contend they were unable to introduce evidence of Marks's past criminal associations with Eiland when Marks invoked his Fifth Amendment constitutional privilege and refused to answer questions about his relationship with Eiland. The appellants conclude that they were denied their Sixth Amendment rights to confront their accuser when the court did not order Marks to answer these four questions and when it allowed Marks's testimony on direct to stand.

We generally review a trial court's decision to limit the scope of cross-examination under the "abuse of discretion" standard. When the limitation directly implicates the Sixth Amendment right to confrontation, however, we conduct a "de novo" review. *See United States v. Robbins*, 197 F.3d 829, 844 (7th Cir. 1999). The situation presented in this case requires courts to balance two competing interests: the witness's Fifth Amendment right against self-incrimination and the defendant's Sixth Amendment right to confront his accusers.

A criminal defendant's right to confront his accusers is basic under the Sixth Amendment. *Pointer v. Texas*, 380 U.S. 400, 401 (1965). The confrontation clause, however, does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense

may wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). The Fifth Amendment provides, *inter alia*, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." *See, e.g., McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991). While the Sixth Amendment confrontation right may be limited by a witness's invocation of his Fifth Amendment right against self-incrimination, a court must exercise vigilance so as not to emasculate the right of cross-examination. *See United States v. Zapata*, 871 F.2d 616, 623 (7th Cir. 1989). When determining the constitutional implications of a witness's refusal to answer questions, courts have properly drawn a distinction between cross-examination questions that are *directly related* to the witness's direct testimony and cross-examination questions that are merely *collateral* to the witness's direct testimony, such as "credibility." *Zapata*, 871 F.2d at 624.

The four questions Marks refused to answer clearly dealt with issues *collateral* to the culpability of McClurge and Carlisle. The trial transcript demonstrates that Marks was asked whether he had ever seen Eiland commit murder, whether he had ever kidnapped anyone else with Eiland, and (twice) whether he had ever covered up any of Eiland's crimes. (Tr. at 967, 975, 983.) Marks had already testified on direct about his relationship with Eiland (Tr. at 706-18, 799), but had limited that discussion to the time and events surrounding the kidnapping referred to herein. (*Id.*) Thus, questions surrounding Marks's relationship with Eiland beyond that time period clearly were aimed at impugning Marks's credibility, an attempt which must cease at the threshold of Marks's own Fifth Amendment rights. The commentary to Rule 608(b) of the Federal Rules of Evidence states that the Rule

> constitutes a rejection of the doctrine . . . that any past criminal act relevant to credibility may be inquired into on cross-examination, in apparent disregard of

> the privilege against self-incrimination. While it is clear that an ordinary witness cannot make a partial disclosure of incriminating matter and then invoke the privilege on cross-examination, no tenable contention can be made that merely by testifying he waives his right to foreclose inquiry on cross-examination into criminal activities for the purpose of attacking his credibility. So to hold would reduce the privilege to a nullity.

Fed. R. Evid. 608(b), Comm. Notes. Courts from other circuits have reached the same conclusion when presented with similar facts. *See*, *e.g.*, *United States v. Brooks*, 82 F.3d 50, 54 (2d Cir. 1996) (holding that a witness's invocation of his Fifth Amendment privilege on a "collateral" matter did not violate defendant's Sixth Amendment right to confrontation); *United States v. Berrio-Londono*, 946 F.2d 158, 158-59 (1st Cir. 1991) (affirming a refusal to strike the direct testimony of a coconspirator who asserted his Fifth Amendment right concerning prior drug deals with a coconspirator other than the defendant).

### C.  Motion for a New Trial

After the verdict, McClurge filed a motion requesting a new trial on the grounds of "newly discovered evidence." McClurge claimed that he had learned from two sources that Marks, one of the government's witnesses, had been "bragging" about killing a drug dealer named "Sporty" and that the FBI was in fact investigating Marks about Sporty's murder. The trial judge denied the motion, holding that this information would not have affected the outcome of the trial.

We review the court's refusal to grant a new trial on the basis of newly discovered evidence for abuse of discretion. *United States v. Woodfolk*, 197 F.3d 900, 904 (7th Cir. 1999). To prevail on a motion for a new trial based on

newly discovered evidence, a defendant must demonstrate that (1) he became aware of the evidence only after trial; (2) he could not, by exercising due diligence, have discovered it sooner; (3) the evidence is material; and (4) in the event of a new trial, the evidence would probably lead to an acquittal. *See United States v. Brumley*, 217 F.3d 905, 909 (7th Cir. 2000).

McClurge argues that the evidence that Marks was being investigated for possible involvement in an unrelated murder would have resulted in his acquittal because it would somehow have conclusively established his defense theory that Marks was responsible for Lewis's kidnapping. We are at a loss to understand how the alleged "newly discovered evidence" could possibly have resulted in an acquittal. McClurge makes no allegation that the shooting of "Sporty" had anything whatsoever to do with the kidnapping of Lewis. Further, Marks had not been charged with any crime in connection with the murder of "Sporty," and the record does not reveal what, if anything, ever came of the investigation. If anything, the evidence merely establishes that Marks was capable of committing violent crimes, but the jury was already aware of the fact that Marks was a career criminal who admitted his participation in the kidnapping of Lewis and his long history of dealing drugs. Furthermore, as the trial judge stated, the "new" evidence would not have had "any conceivable bearing" on the outcome of the trial because the weight of the evidence inculpating McClurge was overwhelming: (1) fibers taken from Lewis's clothing matched those of carpet in the home of McClurge's girlfriend in Jackson, Michigan; (2) the ends of the duct tape used to bind Lewis matched precisely the ends on a role of duct tape seized from McClurge's bedroom; (3) Lewis's gold necklace was found in the back of a Ford Explorer registered to McClurge's mother inside of which Lewis had been confined; (4) Lewis identified McClurge's voice

as the voice of the man who had released him from captivity in the Detroit area; and (5) the testimony of Marks, Cannon, and Avertis all identified McClurge as the leader of the kidnappers.

In light of the overwhelming evidence of McClurge's guilt and the absence of any connection between the alleged newly discovered evidence and McClurge's charged crime, the district court did not abuse its discretion when denying McClurge's motion for a new trial.

### III.  CONCLUSION

Based on the record we hold that the district court did not abuse its discretion (1) in refusing to grant McClurge's motion to sever his trial from that of his co-defendants; (2) in refusing to strike certain testimony that the defense claimed was unduly prejudicial and in violation of his Sixth Amendment confrontation rights because the witness invoked his Fifth Amendment rights against self-incrimination; or much less (3) by refusing to grant a new trial based on newly discovered evidence. The convictions of defendant-appellants McClurge and Carlisle are AFFIRMED.

A true Copy:

      Teste:

                   _____
                   *Clerk of the United States Court of*
                   *Appeals for the Seventh Circuit*