# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-4015

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DURRIEL E. GILLAUM,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02 CR 21—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED SEPTEMBER 17, 2003—DECIDED JANUARY 20, 2004

_____

Before RIPPLE, MANION, and WILLIAMS, *Circuit Judges.*

MANION, *Circuit Judge.* A jury found Durriel Gillaum guilty of possession of a firearm by a felon and sentenced him to a prison term of 188 months. On appeal, Gillaum challenges the execution of the search warrant that uncovered the prohibited firearm, his interrogation, the failure of the government promptly to disclose a police report to defense counsel, the calculation of his prison sentence, and the constitutionality of the federal felon-in-possession of a firearm statute. We affirm.

## I. Background

On December 4, 2001, at approximately 7:00 a.m., members of the Dane County (Wisconsin) Narcotics and Gangs Task Force, led by Detective Steven Greiber and Sergeant Gary Anderson, executed a search warrant for the apartment of Durriel Gillaum. The purpose of the search warrant was to search for drugs (specifically, but not exclusively, cocaine base), drug paraphernalia, and other items likely to constitute evidence of drug trafficking. In the four months prior to December 2001, on four occasions undercover officers had purchased cocaine from persons in the apartment.

Prior to entering Gillaum's apartment, Anderson pounded on the door to the apartment and shouted, "Police, search warrant." Anderson then began counting to himself and waving his arm to let the entry team know how much time had elapsed. After he waited five seconds, Anderson heard the sound of footsteps coming from inside the apartment. Anderson testified that the footsteps did not sound as if they were getting closer to the door and he could not discern whether they were moving from left to right or right to left.

After listening to the footsteps for three to five seconds, Anderson ordered a forcible entry into the apartment. Anderson later testified that he did not believe three to five seconds was sufficient time for the footsteps to reach the entry door. In his report and recommendation denying Gillaum's motion to suppress the discovery of the handgun, the magistrate judge found that approximately eight to ten seconds elapsed between Anderson's knock on the entry door and the task force's forcible entry into the apartment.

The footsteps Anderson heard appear to have been made by 13-year-old Tryphenia Sykes. Tryphenia is the daughter

of Gillaum's wife, Mary Sykes.[1] Tryphenia testified that she was eating breakfast and watching television when she heard a knock on the door and someone say something. She started towards the door but did not reach the door before the task force rushed in.

Inside the apartment, the task force spread throughout the apartment. Members of the task force found Gillaum and Mary in their bed. Gillaum was handcuffed, taken to the living room and informed of the search warrant. In the living room, members of the task force learned that Gillaum was diabetic. Gillaum was asked if he was experiencing any medical problems and was told if he was having problems to let someone know. Gillaum was also asked if he needed any food. Gillaum indicated that he was all right and did not need any food. Detective Greiber then led Gillaum into the bathroom.

Once inside the bathroom, Greiber removed Gillaum's handcuffs and read Gillaum the *Miranda* warnings. Greiber asked Gillaum if he was familiar with the warnings. Gillaum told Greiber that he was familiar with the warnings and that he was willing to talk to Greiber.

Greiber then questioned Gillaum for approximately half an hour concerning drug activities. Part of this questioning focused on a drug dealer named Kevin Harper. Gillaum refused to provide Greiber with any information concerning Harper. Greiber testified that Gillaum was coherent and did not appear to be under the influence of drugs or alcohol. Greiber also testified that Gillaum did not express a desire to cease the interview, nor did Gillaum at any time assert

---

[1] Gillaum is not the biological father of Mary Sykes' children. Apparently, however, her children consider Gillaum their father and we treat them as his children in this opinion.

his right to remain silent. Gillaum testified that he told Greiber that he (Gillaum) ended the interview by telling Greiber he no longer wanted to talk. After the interview Gillaum was again handcuffed and led back to the living room.

Meanwhile, members of the task force discovered in Gillaum's bedroom closet a Bryco .38 handgun and two magazines of ammunition. Approximately 15 minutes after the first interview in the bathroom, Greiber took Gillaum to the bedroom where he allowed Gillaum to dress and questioned him concerning the handgun. Greiber did not provide Gillaum with a second round of *Miranda* warnings. Greiber testified that Gillaum told him that the gun was not his but that he knew the gun was in his bedroom and that his fingerprints would likely be found on it, because he had handled the gun and worked the ammunition through it to make sure it worked and that it was safe.

On February 21, 2002, a federal grand jury in the Western District of Wisconsin returned a one-count indictment charging Gillaum with possession of a firearm in violation of 18 U.S.C. § 922(g)(1). On April 15, 2002, Gillaum filed a motion to suppress the handgun asserting, *inter alia*, that the failure of the task force to obey the knock and announce requirements made the search unconstitutional. Gillaum also filed a motion to suppress his statement to Greiber in the second interview, asserting that the statement was obtained in violation of Gillaum's right against self-incrimination. Finally, Gillaum filed a motion to dismiss the indictment, contending that 18 U.S.C. § 922(g)(1) is unconstitutional because it exceeds Congress's power under the Commerce Clause of the United States Constitution.

On May 17, 2002, after an evidentiary hearing on Gillaum's suppression motions, a magistrate judge issued a report and recommendation concluding that Gillaum's

motions should be denied. On May 30, 2002, the district court adopted the report and recommendation and denied all of Gillaum's motions. Gillaum's case then proceeded to trial.

At trial, Gillaum and two of his wife's children testified to the effect that the gun had been brought into his apartment by a man named Jori Stinson. According to Gillaum, Stinson had sold the gun to Rashan Ross, a friend of Gillaum's who, at the time, was staying with Gillaum and who had access to all areas of the apartment. Gillaum testified that he told Ross that he could not keep the gun in the apartment. Gillaum also denied that he told Greiber that he had seen the gun or worked ammunition through it. Sharon Sykes, one of Gillaum's daughters, testified that she had seen Stinson in the apartment and had overheard Gillaum tell Ross, "[y]ou can't keep that[2] here." Shawn Sykes, Gillaum's son, testified that he was present in Gillaum's apartment when Stinson sold Ross the gun and was later present when Gillaum told Ross that Ross could not keep the gun in the apartment.

After the jury entered deliberations, problems arose. The jury requested a transcript of certain portions of the testimony of Gillaum and Greiber. Afer receiving a rough transcript of the testimony, the jury sent a note to the court indicating that it could not resolve discrepancies between their memories of Gillaum's testimony and the transcript of his testimony. The court found that there were errors in the transcript. An important error was in the transcribed version of Gillaum's testimony. The rough transcript had Gillaum admitting to handling the gun. The parties agreed that Gillaum made no such admission. The district court

---

[2]  Sharon testified that she never actually saw the gun.

found that the errors were likely to confuse the jury on critical issues and declared a mistrial.

A second trial was held a month later and, insofar as this appeal is concerned, it was a reprise of the first trial. Gillaum and his children offered the same testimony as at the first trial. The trial lasted only a day and the jury returned a guilty verdict that same day.

During the preparation of the presentence report, the government for the first time put forward a copy of a Bureau of Alcohol, Tobacco, and Firearms ( "BATF") trace report concerning the handgun found in Gillaum's apartment. The report indicated that Brian Hesterly was the original owner of the gun, having purchased it from a sporting goods store. According to the report, a BATF agent interviewed Hesterly. Hesterly told the agent that his home had been burglarized and the gun was stolen. Included with the BATF report was a copy of a police report of the Fitchburg, Wisconsin police department's investigation of the burglary. The Fitchburg police report noted an interview with Hesterly. In that interview, Hesterly told a Fitchburg police officer that he believed Stinson was the perpetrator of the burglary.

On October 8, 2002, Gillaum filed a motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. Gillaum argued that the BATF report constituted exculpatory evidence the government failed to turn over in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83, 87 (1963). On February 19, 2003, the district court denied Gillaum's motion.

While Gillaum's motion was pending, the district court entered a judgment of conviction. Gillaum was sentenced to 188 months in prison. Gillaum's prison sentence is to be followed by five years of supervised release.

Gillaum is eligible for such a substantial sentence because he has previously been convicted of aggravated battery and attempted robbery in Cook County, Illinois and armed robbery and possession with intent to deliver cocaine in Dane County, Wisconsin. A defendant who is found guilty of possession of a firearm in violation of 18 U.S.C. § 922(g) and has at least three prior convictions that are considered either a "violent felony" or a "serious drug offense" is subject to a mandatory minimum sentence of fifteen years and a maximum sentence of life. 18 U.S.C. § 924(e). If a defendant does not have at least three such prior convictions, he is subject to a statutory maximum of ten years' imprisonment. 18 U.S.C. § 924(a)(2).

## II. Discussion

Gillaum raises several issues on appeal. First, he argues that the forcible entry by the task force into his apartment was unreasonable and violated his right under the Fourth Amendment to be free from unreasonable searches. Gillaum argues that the remedy for this violation should be the suppression of evidence uncovered in the search, namely, the handgun and ammunition. Second, Gillaum argues that his second interview with Greiber (in the interview in Gillaum's bedroom) was not voluntary and violated his right against self-incrimination. Gillaum argues that the remedy for this violation is the suppression of his statement to Greiber that he handled the handgun. Third, Gillaum argues that he is entitled to a new trial because the government failed to promptly provide him with a copy of the BATF report. Fourth, Gillaum challenges the length of his sentence. He argues that, because his Illinois convictions were discharged and certain of his civil rights had been restored, these convictions cannot be counted toward the three necessary for him to be subject to the sentence en-

hancement of 18 U.S.C. § 924(e)(1). Finally, Gillaum argues that 18 U.S.C. § 922(g)(1) represents an unconstitutional exercise of Congress's power under the Commerce Clause of the United State Constitution.

## A.  The Forcible Entry

Gillaum first argues that the task force failed to wait a reasonable period of time after announcing its presence and forcibly entering his apartment. According to Gillaum, the sound of footsteps for a limited period of time (three to five seconds) was insufficient to justify a forcible entry. The district court, adopting the magistrate judge's report and recommendation, found that the sound of footsteps moving laterally obviated the need to wait a reasonable period of time after a knock and announce.

We review the district court's factual findings for clear error in deciding a motion to suppress. *United States v. Jones*, 208 F.3d 603, 606 (7th Cir. 2000). In doing so, "we must keep in mind that 'our inquiry is factually based and requires that we give particular deference to the district court that had the opportunity to hear the testimony and observe the demeanor of the witness.' " *Id.* (quoting *United States v. Williams*, 945 F.2d 192, 195 (7th Cir. 1991)). This deference is equally applicable where credibility determinations have been made by a magistrate judge and the report and recommendation of the magistrate judge have been adopted by the district court. Legal determinations (including whether facts constitute exigent circumstances) of the district court justifying its decision to deny a motion to suppress are subject to de novo review. *Id.* (citing *United State v. Adames*, 56 F.3d 737, 747 (7th Cir. 1995)); *United States v. Howard*, 961 F.2d 1265, 1267 (7th Cir. 1992).

"[T]he method of [a law enforcement] officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search or seizure." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995); *United States v. Espinoza*, 256 F.3d 718, 723 (7th Cir. 2001), *cert. denied*, 534 U.S. 1105 (2002). Absent exigent circumstances, law enforcement officers must knock on the entry door of a dwelling and "announce their identity and intention before attempting forcible entry." *Id.* (citing *Wilson*, 515 U.S. at 934). This court has recognized that "a necessary corollary of the knock and announce requirement is that officers must wait a reasonable amount of time after announcing their intention to serve a search warrant before attempting a forcible entry." *Id.* (citing *Jones*, 208 F.3d at 609-10).

In this case, however, the appropriate inquiry is not whether Anderson waited a reasonable time before ordering the forcible entry into the apartment. Rather, the question is whether the sound of footsteps moving laterally in relation to the entry door was sufficient to excuse the task force from waiting a reasonable period of time.[3] In other words, did exigent circumstances exist that justified disregarding the knock and announce requirement?

This court has held that "[e]xigent circumstances exist . . . when a suspect's awareness of the search would increase the danger to police officers or others, or when an officer must

---

[3]  This case is not, therefore, governed by the recent decision of the Supreme Court in *United States v. Banks*, 540 U.S. ___ (2003). In that case, the Supreme Court held that 15-20 seconds was a sufficient period of time for the police to wait when executing a knock-and-announce warrant *without hearing any noise or movement* before forcibly entering the apartment of a suspected drug dealer. In this case there was an intervening act—the sound of footsteps inside the apartment not moving towards the door.

act quickly to prevent the destruction of evidence." *Howard*, 961 F.2d at 1267 (quoting *United States v. Singer*, 943 F.2d 758, 762 (7th Cir. 1991)). Whether such exigent circumstances exist "must be viewed 'from the totality of circumstances known to the officers at the time [of the forcible entry].' " *Id.* (quoting *United States v. Lindsey*, 877 F.2d 777, 781 (9th Cir. 1989)).

On the basis of the record before us, we cannot conclude that the factual findings of the district court were in error. The magistrate judge found Anderson to be a credible witness and concluded that Anderson honestly believed that he was hearing lateral movement. Moreover, we conclude that exigent circumstances existed that justified Anderson's order. Taking into consideration only those facts known to Anderson at the time he ordered the forcible entry, the sound of footsteps coming from inside the apartment and not moving closer to the entry door was sufficient for Anderson to order the forcible entry and disregard the knock and announce requirement.

The search warrant was for drugs, specifically cocaine. Of course, drugs, particularly cocaine, are the quintessential form of evidence that may be easily destroyed. Anderson testified that he was familiar with the layout of the apartment and knew that the bathroom, the likely scene of any attempt at destroying evidence, was located to one side of the entry door. Given this, the movement in the apartment, from one side of the apartment to the other, could have indicated an attempt to destroy evidence. The fact that Anderson's fears were not realized, that the footsteps were those of a 13-year-old girl, is immaterial. Anderson could not have known who was moving in the apartment. Given the layout of the apartment and the evidence that was the subject of the warrant, Anderson was justified in believing

that someone might be attempting to destroy evidence. He was, therefore, justified in ordering the forcible entry into the apartment.

Moreover, even if we determined that the forcible entry of the task force into Gillaum's apartment violated Gillaum's rights under the Fourth Amendment, he would not be entitled to suppression of the handgun. This court has held that suppression is not the proper remedy for a violation of the knock and announce rule. *See United States v. Langford*, 314 F.3d 892, 894 (7th Cir. 2002), *cert. denied*, ___ U.S. ___ , 2003 WL 21696159 (2003).

## B.  Gillaum's Interrogation

Gillaum next argues that his statements to Greiber, particularly his statements that he knew the handgun was in the apartment and that he had handled the handgun, should be suppressed as they were obtained in violation of his Fourth and Fifth Amendment rights. Because we have concluded that Gillaum's Fourth Amendment rights were not violated, we consider only the Fifth Amendment challenge. Whether a confession or statement to the police is voluntary is a matter of law that this court reviews de novo. *United States v. Jordan*, 223 F.3d 676, 683 (7th Cir. 2000) (quoting *United States v. D.F.*, 115 F.3d 413, 419 (7th Cir. 1997)). However, this court reviews "the determination of historical facts of the case . . . for clear error." *Id.*

Gillaum argues that Greiber violated his Fifth Amendment right to remain silent. Gillaum maintains that he invoked his right to remain silent by allegedly telling Greiber after the interrogation in the bathroom that he did not want to talk to Greiber anymore. Because Gillaum told Greiber he no longer wished to talk, "it was incumbent upon the police to scrupulously honor [his] assertion of his right to remain silent."

Gillaum principally relies on the United States Supreme Court's decision in *Michigan v. Mosley*, 423 U.S. 96 (1975). In *Mosley*, the Court held that the admissibility of statements obtained after a defendant invokes his right to remain silent is dependent on whether the defendant's right was "scrupulously honored." 423 U.S. at 103. The Court set forth several non-exclusive factors to determine whether interrogation was properly resumed. *Id.* These factors include "an inquiry into the amount of time that lapsed between interrogations; the scope of the second interrogation; whether new *Miranda* warnings were given; and the degree to which police officers pursued further interrogation once the suspect had invoked his right to silence." *United States v. Schwensow*, 151 F.3d 650, 658 (7th Cir. 1998) (citing *Mosley*, 423 U.S. at 104-05).

Gillaum's argument that his right to remain silent was not "scrupulously honored" has a fatal defect: he never invoked his right to remain silent. The magistrate judge heard the testimony of Greiber and Gillaum. Greiber testified that Gillaum did not invoke his right to remain silent. Gillaum testified that he did invoke his right to remain silent. The magistrate judge, with the advantage of having the witnesses before him, made an explicit credibility determination finding that Gillaum never invoked his right to remain silent. The district court adopted the report and recommendation of the magistrate judge. That finding is supported by the record and is not clearly erroneous. *See United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (quoting *United States v. Hardamon*, 188 F.3d 843, 848 (7th Cir. 1999)) ("Under the clearly erroneous standard, 'if two permissible views exist, the fact-finder's choice between them cannot be clearly erroneous.' "); *id.* at 872 (defendant made no showing that a district court's credibility determination was "exceedingly improbable; she merely presents a contradictory statement of facts. That is not enough.").

Gillaum also argues that his confession was not voluntary because of the coercive atmosphere of the interview. Gillaum argues that the forcible entry of the task force into his bedroom where he was sleeping, early in the morning, the first interrogation in a small bathroom, his diabetic condition and low blood pressure, together with statements by Greiber that Gillaum would be better off if he provided information concerning another drug dealer and that his wife would be taken into custody if Gillaum did not cooperate, contributed to an atmosphere that made his statements to Greiber involuntary under the totality of circumstances.

This court has held that "[a] confession is voluntary if, in the totality of circumstances, it is the 'product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.' " *Huerta*, 239 F.3d at 871 (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)). "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'. . . ." *Id.* (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Factors relevant to a determination that police conduct is coercive include "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Id.*

Considering these factors, we conclude that Gillaum's statements to the police were voluntary. Gillaum was thirty-seven at the time of his arrest and from past arrests was personally familiar with the criminal justice system. He was read the *Miranda* warnings and was asked whether he understood the warnings. Gillaum told Greiber he under-

stood the warnings, and told Greiber that he had been arrested on five or six previous occasions and had the warnings read to him. Prior to his interrogation, members of the task force learned that Gillaum was diabetic and asked Gillaum if he was feeling all right and if he needed insulin or something to eat. Gillaum was also told to tell someone if he developed problems. Gillaum indicated that he did not need his medication.

Additionally, both interrogations together lasted less than 45 minutes and Gillaum was not handcuffed while being questioned. Greiber testified that Gillaum was coherent and did not appear to be under the influence of drugs or alcohol. Greiber also testified (and Gillaum does not dispute) that he did not use physical force or yell at Gillaum.

The parties differ as to whether Greiber threatened Gillaum. Gillaum, as indicated above, claims that Greiber threatened to take Mary into custody and promised to ensure Gillaum was treated leniently if he provided information concerning a drug dealer. Greiber testified that he never threatened Gillaum. Greiber testified that although he did ask if Gillaum was willing to cooperate and talk about the other drug dealer, Gillaum was not willing to provide any information and Greiber did not suggest that Gillaum would be treated more favorably if he cooperated.

Once again, the magistrate judge who received this testimony chose to accept Greiber's version of events and we cannot say that this decision was clearly erroneous. Under the totality of circumstances, Gillaum's statements to Greiber were voluntary.

### C. The Disclosure of the BATF Report

Gillaum next argues that the government failure to disclose the BATF report entitles him to a new trial because the

BATF report constitutes newly discovered evidence or because the failure of the government to disclose the report constitutes a *Brady* violation. Gillaum argues that the report corroborates his testimony and the testimony of two of his children that Stinson brought the gun into the apartment and sold it to Ross. The district court held that Gillaum had not shown that the report was material or that the evidence would have been favorable to him and thus denied Gillaum's motion for a new trial.

The decision to grant a new trial is committed "to the sound discretion of the trial judge." *United States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999). This court approaches motions for a new trial "with great caution and [is] wary of second guessing the determinations of both judge and jury." *Id.* (quoting *United States v. DePriest*, 6 F.3d 1201, 1216 (7th Cir. 1993)). To be entitled to a new trial on the basis of newly discovered evidence, a defendant must show (1) the defendant became aware of the evidence only after trial; (2) the defendant could not, by exercising due diligence, have discovered the evidence sooner; (3) the evidence is material; and (4) in the event of a new trial, the evidence would probably lead to an acquittal. *United States v. McClurge*, 311 F.3d 866, 874 (7th Cir. 2002), *cert. denied*, ___ U.S. ___ , 123 S. Ct. 2101 (2003). Where the defendant alleges a *Brady* violation, the defendant is entitled to a new trial when the defendant can establish "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial." *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995).

We address here only the materiality of the BATF report—the probability that the presentation of the report would have led to a different outcome in the trial. As this court has held, "[e]vidence is material [under *Brady*] only if

there exists a 'reasonable probability' that its disclosure to the defense would have changed the result of the trial." *United States v. Irorere*, 228 F.3d 816, 829 (7th Cir. 2000). The question is "whether in [the absence of the suppressed evidence, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley*, 514 U.S. 419, 434 (1985) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). "[T]he effect that a particular piece of evidence is likely to have had on the outcome of a trial must be determined in light of the full context of the weight and credibility of all evidence actually presented at trial." *Silva*, 71 F.3d at 670.

In this case, the question for the jury was whether Gillaum, a convicted felon, possessed the handgun. The critical evidence at trial was the testimony of Gillaum and Greiber. Greiber testified that Gillaum told him that he knew the gun was in the bedroom, he had handled the gun, and had cycled ammunition through it. Gillaum testified that he had not made these statements to Greiber. Gillaum also testified that the gun belonged to Ross and that he had ordered Ross to get the gun out of his apartment. As the government points out, and as the district court noted in its decision to deny Gillaum's motion, the government never challenged Gillaum's testimony concerning how the gun came to Gillaum's apartment.

Had the BATF report been properly disclosed to the defense, there would not have been a reasonable probability

the report would have changed the outcome of trial.[4] In this case, the history of the gun prior to entering Gillaum's apartment is immaterial. Put differently, a jury could have considered the BATF report, found it persuasive, and still reached the same decision. The BATF report, if accurate (the police report attached to the BATF report only recited Hesterly's belief that the gun was stolen by Stinson), corroborates only a portion of Gillaum's presentation, that Stinson stole the handgun, an issue the government did not need to dispute. *Cf. United States v. Thomas*, 321 F.3d 627, 634 (7th Cir. 2003) ("[T]he government is not required to show how [a defendant] acquired the firearm, just that he had possession of one. Even if he held a gun only to inspect it, [the defendant] would be guilty under 18 U.S.C. § 922(g)."); *United States v. Lane*, 267 F.3d 715, 718 (7th Cir. 2001) ("Physical control over a gun is remarkably easy to effect."). The report adds nothing to the issue in dispute— that Gillaum had possession of the handgun. Evidence that corroborates a portion of a defendant's story that is not directly relevant to the crime charged does not justify a finding of materiality under *Brady*. *Duest v. Singletary*, 967 F.2d 472, 479 (11th Cir. 1992), *vacated on other grounds*, 507 U.S. 1048 (1993); *see also Lingle v. Iowa*, 195 F.3d 1023, 1026 (8th Cir. 1999) (holding that medical report was not material for *Brady* purposes where report, at best, showed lack of vaginal penetration of sexual abuse victim; penetration was not necessary for conviction of sexual abuse of a minor under Iowa law); *United States v. Booz*, 451 F.2d 719, 725 (3d

---

[4] We do not mean to suggest that the government's actions were proper. Like the district court, we find it difficult to understand why the government failed to turn over the burglary report to Gillaum. We only suggest that here, the failure does not merit a new trial for Gillaum.

Cir. 1971) (finding no *Brady* violation where withheld statements corroborated a portion of defendant's story related to the defendant's whereabouts in the hours after the time of crime but did not corroborate the portion of the defendant's story involving the defendant's whereabouts at the time of the crime). There is not a reasonable probability that the BATF report would have changed the outcome under *Brady.* Thus it is not probable that the introduction of the BATF report in a new trial would lead to an acquittal under Rule 33.

### D.  The Calculation of Gillaum's Sentence

We next turn to Gillaum's argument concerning the calculation of his sentence. Gillaum argues that the district court improperly used two Illinois convictions to reach the three necessary for Gillaum to be considered an "armed career criminal" and subject to a sentence enhancement pursuant to 18 U.S.C. § 924(e)(1). The district court rejected Gillaum's argument and sentenced Gillaum to a prison sentence of 188 months.

Pursuant to 18 U.S.C. § 924(e)(1), a defendant found guilty of violating any provision of 18 U.S.C. § 922 "and who has three previous convictions . . . for a violent felony or a serious drug offense, or both . . ." shall be sentenced to a mandatory *minimum* prison sentence of 15 years. The difference in sentencing for a defendant who has not previously been convicted of three such offenses is considerable: If a defendant does not have at least three such prior convictions the defendant is subject to a statutory *maximum* of ten years' imprisonment. 18 U.S.C. § 924(a)(2).

Not all previous convictions can be used to reach the three necessary for the sentence enhancement. Section 921(a)(20) of Title 18 provides, in part, that:

> Any conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored shall not be considered a conviction for purposes of this chapter, unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(20). Put more clearly, a conviction does not count toward the three necessary for an enhanced sentence if the defendant "has had civil rights restored" unless the defendant has been put on notice that he may not "ship, transport, possess, or receive firearms."

On October 27, 1983, Gillaum received an "Order For Discharge" signed by the Governor of Illinois (the "Order"). The Order stated that Gillaum was "finally discharged" from the convictions for attempted robbery and aggravated battery. The Order also stated that Gillaum's "rights to vote and administer estates are regained." There was no notice that Gillaum could not possess a firearm.

Gillaum argues that the Order restored his civil rights but did not give him notice that he could not possess a firearm. As a result, Gillaum argues, the Illinois convictions cannot be considered qualifying felonies for sentence enhancement. If the Illinois convictions are not considered, Gillaum would not have the requisite three prior qualifying felonies and would not, therefore, be subject to an enhanced sentence. The United States argues that because *all* of Gillaum's civil rights were not restored by the Order, the convictions were properly considered.

At issue here, therefore, is whether the restoration of some of a defendant's civil rights (here the rights to vote and administer estates) triggers the notice requirement of § 921(a)(20). In other words, if a discharge order states that

some specific civil rights have been restored but does not notify the defendant that he is prohibited from possessing guns, can the conviction covered by such order still count towards sentence enhancement under § 924(e)(1)? This is a question of law that this court reviews de novo.

This court has reviewed § 921(a)(20) on several occasions. There was some discussion at oral argument as to possible conflicts in the holdings of these cases and whether they can be reconciled. As discussed below, these cases are not in conflict and a close reading indicates that it is the law of this circuit that a conviction is not counted only where the discharge order restores *all* of a defendant's civil rights and there is no notice to the defendant that he may not possess firearms.

Section 921(a)(20) has been described by this court as "an anti-mousetrapping rule." *United States v. Erwin*, 902 F.2d 510, 512 (7th Cir. 1990). The notice requirement for convictions that have been discharged for the conviction to count "is designed to prevent states from deceiving ex-convicts into believing they have the right to carry guns." *United States v. Wagner*, 976 F.2d 354, 355 (7th Cir. 1992).

In some states, upon the completion of a criminal defendant's sentence, all or some of the defendant's civil rights are restored by the operation of statute. In other states, however, the defendant is given documentary evidence that his civil rights are restored. This court has held that, where a criminal defendant is given a piece of paper restoring his civil rights, a court's inquiry is limited to that document. *See United States v. Glaser*, 14 F.3d 1213, 1218 (7th Cir. 1994) ("When the state gives [a] person a formal notice of the restoration of civil rights, . . . the final sentence of § 921(a)(20) instructs us to look, *not at the contents of the state's statute books but at the contents of the document.*") (emphasis added). If the document restores the defendant's

civil rights but does not provide that the defendant may not possess firearms, the underlying conviction cannot count towards sentence enhancement. *Id.* ("The statutory question is whether, when the state disseminates a writing purporting to restore *all* civil rights, the document contains a firearms qualification.") (emphasis added). This court has explained the rationale as follows:

> If the state sends the felon a piece of paper implying that he is no longer "convicted" and that *all* civil rights have been restored, a reservation in a corner of the state's penal code can not be the basis of a federal prosecution. A state must tell the felon point blank that weapons are not kosher. The final sentence of § 921(a)(20) can not logically mean that the state may dole out an apparently-unconditional restoration of rights yet be silent so long as any musty statute withholds the right to carry guns. Then the state never would need to say a peep about guns; the statute would self-destruct. It must mean, therefore, that the state sometimes must tell the felon that under state law he is not entitled to carry guns. . . . When, however, the state sends no document granting pardon or restoring rights, there is no potential for deception, and the question becomes whether the particular civil right to carry guns has been restored by law.

*Erwin*, 902 F.2d at 512-13 (emphasis in original).

The text of the previous decisions of this court makes it clear that a conviction does not count only if the discharge document restores *all* of the defendant's civil rights and the discharge conviction does not state that the defendant may not possess a firearm. In *Erwin*, this court stated that "[i]f the state sends the felon a piece of paper implying that he is no longer 'convicted' and that *all* civil rights have been restored, a reservation in a corner of the state's penal code

cannot be the basis of a federal prosecution." *Id.* (quoted in *Wagner*, 976 F.2d at 355; *Glaser*, 14 F.3d at 1218; *Dahler v. United States*, 143 F.3d 1084, 1087 (7th Cir. 1998)). Importantly, the italicized emphasis on "all" was in the original opinion. In *Dahler*, this court vacated the sentencing decision of the district court where the Wisconsin discharge document provided that "any civil rights lost as result of [this] conviction . . . are restored." *Dahler*, 143 F.3d at 1087. This court held that in this context, " '[a]ny' and 'all' convey the same message to the recipient." *Id.*

The logic of this court's rationale also makes it clear that the discharge document must restore all of the defendant's civil rights. If the discharge document states that all of a defendant's civil rights have been restored but does not expressly state that the defendant may not possess firearms, presumably the right to possess firearms is included with *all* civil rights, and the defendant's sentence cannot be enhanced. To permit such would be, in effect, a "mousetrap"—baiting the defendant into believing that he has a right to carry a gun when he, in fact, does not. However, if the state restores only specific civil rights, there is no mousetrap—the restoration of specifically listed rights cannot be said to restore additional civil rights (including the right to possess a firearm) to the defendant that are not among those listed.

Here, not all of Gillaum's civil rights were restored. Instead, the discharge order provided only that Gillaum's rights to vote and administer estates had been restored. It is difficult to imagine that a statement restoring two specific rights, wholly unrelated to the possession of a firearm, could "deceive an ex-convict into believing they have the right to carry guns." *Wagner*, 976 F.2d at 355. Gillaum's Illinois convictions were properly counted.

At oral argument, Gillaum's counsel argued that this court's decisions in *Dahler* and *Glaser* suggest that the

Illinois convictions should not count. In both of these cases, the defendants' discharge documents restored all of their civil rights but there was not a proper notice to the defendant that he could not carry firearms. In *Glaser*, the discharge document stated that the restoration of the defendant's civil rights did not relieve the defendant "of the disabilities imposed by the Federal Gun Control Act." This court found that this statement was insufficient to satisfy the notice requirement of § 921(a)(20). *Glaser*, 14 F.3d at 1217. In *Dahler*, as addressed above, the discharge document provided that "any civil rights lost as result of [this] conviction . . . are restored." *Dahler*, 143 F.3d at 1087. This court concluded that specific notice of the prohibition on possessing firearms was required. Because such notice was not provided, Dahler was not subject to the enhancement, although he still had one prior conviction which made him ineligible to carry a firearm.

Gillaum's counsel also argues that *Dahler* and *Glaser* stand for the proposition that there must be unambiguous notice to the defendant in the text of the discharge document that he may not possess a firearm for the conviction to count towards an enhancement of a defendant's discharge. He is correct—when notice is required. As discussed above, notice is not required when the discharge document does not restore all of a defendant's civil rights. Because all of Gillaum's civil rights were not restored, there is no notice requirement. Gillaum's Illinois convictions were properly counted.

**E.   The Constitutionality of the Federal Felon-In-Possession Statute**

Finally, Gillaum argues that 18 U.S.C. § 922(g)(1) is an unconstitutional exercise (facially and as applied to him)

of Congress's power under the Commerce Clause of the United States Constitution. Gillaum concedes, however, that this court has previously rejected this argument. *See, e.g.*, *United States v. Lemons*, 302 F.3d 769 (7th Cir. 2002), *cert. denied*, 537 U.S. 1049 (2002); *United States v. Mitchell*, 299 F.3d 632 (7th Cir. 2002), *cert. denied*, *sub nom.*, *Peete v. United States*, 537 U.S. 1130 (2003); *United States v. Wesela*, 223 F.3d 656 (7th Cir. 2000). He has raised the issue on appeal only so as to preserve the argument in the event of a change in the law. We note that Gillaum has raised this argument and we decline to revisit our well established precedents.

### III. Conclusion

For the foregoing reasons, the decisions of the district court are AFFIRMED.

WILLIAMS, *Circuit Judge*, concurring in part and dissenting in part. I join the majority opinion with respect to parts II.A-C and II.E, but respectfully disagree with its conclusion in part II.D that Gillaum must have *all* civil rights restored by a discharge order before his prior Illinois convictions may be excluded at sentencing.

Section 921(a)(20) provides that "[a]ny conviction . . . for which a person . . . *has had civil rights restored* shall not be considered a conviction for purposes of this chapter, unless such . . . restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive

firearms." 18 U.S.C. § 921(a)(20) (emphasis added). On its face, the statute does not require that *all* civil rights be restored, and it is here that our inquiry should end. *Hubbard v. United States*, 514 U.S. 695, 703 (1995) ("In the ordinary case, absent any 'indication that doing so would frustrate Congress's clear intention or yield patent absurdity, our obligation is to apply the statute as Congress wrote it.' ") (citation omitted); *see also United States v. Chemetco, Inc.*, 274 F.3d 1154, 1159 (7th Cir. 2001) ("When the language of a statute is clear and unambiguous, we must give effect to its plain meaning unless doing so would 'thwart the purpose of the overall statutory scheme.' ") (citation omitted).

The cases on which the majority relies, *see Dahler v. United States*, 143 F.3d 1084 (7th Cir. 1998), and *United States v. Glaser*, 14 F.3d 1213 (7th Cir. 1994), are not outcome determinative because we were not in those cases addressing the question of whether *all* civil rights had to be restored before a conviction was to be excluded. Indeed, in those cases we were dealing with documents that explicitly restored "any" or "all" civil rights that had been lost as a result of conviction, and that is clearly not the case in the matter presently before us. *See Dahler*, 143 F.3d at 1087 (order provided that "*[a]ny* civil rights lost as a result of conviction . . . are restored by virtue of this discharge") (emphasis added); *Glaser*, 14 F.3d at 1218-19 (order restored Glaser to "*all* civil rights and to full citizenship . . . the same as if such conviction had not taken place") (emphasis added).[1] Our commentary in *United States v. Erwin*, 902 F.2d 510 (7th Cir. 1990),

---

[1] This court's decision in *United States v. Wagner*, 976 F.2d 354 (7th Cir. 1992), is similarly inapposite as Wagner did not allege that he ever received any express notice that his civil rights had been restored, and the court was examining whether his civil right to carry guns had otherwise been restored under Indiana state law. *Id.* at 355.

that "[i]f the state sends the felon a piece of paper implying that he is no longer 'convicted' and that *all* civil rights have been restored, a reservation in a corner of the state's penal code can not be the basis of a federal prosecution," should not be read to require that *all* civil rights must be restored before a document restoring civil rights is sufficient to exclude a conviction as provided in section 921(a)(20). 902 F.2d at 512-13 (emphasis in original). This dicta at best discusses one situation in which a government document might actually restore civil rights. Any more expansive reading of *Erwin* is in direct conflict with the language in the statute.

I recognize the intuitive appeal of the argument that when only a few civil rights are explicitly restored by a discharge order, and others are not, a person such as Gillaum could not reasonably be "mousetrapped" into believing his right to carry firearms had been restored when it was not specifically enumerated in the order. The statute, however, does not make an enumeration distinction. It simply provides that if a person "had civil rights restored," the conviction shall not count unless the person was informed in the right-restoring document that he or she "may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(20). Because Gillaum had civil rights restored by the discharge orders from the Governor of Illinois, and was not informed in those documents that he could not possess or carry a firearm, these prior convictions should not have been used in determining his sentence. For these reasons, I would vacate the judgment of the district court and remand for resentencing without the inclusion of these prior convictions.[2]

---

[2]   It may be that Gillaum ultimately receives the same sentence, as the district court only relied on three of his many previous
(continued...)

A true Copy:

    Teste:

                    _____

                    *Clerk of the United States Court of*
                    *Appeals for the Seventh Circuit*

---

[2] (...continued)
convictions (only two of which are at issue here), and one or more of his other convictions (for which he did not receive a discharge order) may meet the requirements of 18 U.S.C. § 924. *See Dahler*, 143 F.3d at 1088.

---